**BELL v. UNITED STATES.**
**Civ. A. No. 4148.**

United States District Court
M. D. Pennsylvania.

May 7, 1954.

H. R. Van Deusen, Jr., H. R. Van Deusen, Scranton, Pa., for plaintiff.

Walter H. Beaman, Jr., Sp. Asst. to Atty. Gen., J. Julius Levy, U. S. Atty., Scranton, Pa., for defendant.

WATSON, Chief Judge.

In this action the plaintiff seeks to recover income tax alleged to have been overpaid in the year 1944.

An agreed statement of facts, with exhibits attached thereto, was filed by the parties. The case was tried by the Court without a jury.

### Discussion

In 1927 the plaintiff, Grant L. Bell, purchased 145 shares of the Payne Coal Company stock for $100 per share, and in the following year he acquired an additional 105 shares at the same price. At this time the authorized capital stock of this Pennsylvania corporation was 2,000 shares, of which 1,500 were eventually issued. These were held by the following persons in the amounts stated:

| | |
|---|---|
| Grant L. Bell | 250 |
| J. H. Blackman | 33 |
| R. H. Buchanan | 475 |
| A. W. Crossman | 125 |
| Ralph W. Rymer | 142 |
| Bruce Payne | 475 |

About the middle of 1933, Bruce Payne offered to buy the plaintiff's stock in the Payne Coal Company at $75 per share, part cash and part credit. Plaintiff conditioned acceptance of the offer upon Payne's making a similar offer to Buchanan, Crossman, and Rymer.

Payne proposed that the stock of the above-named persons be purchased by the corporation. Plaintiff refused to agree to this proposal. Payne then offered to endorse the promissory notes which under the terms of the proposal the corporation would give to the stockholders.

On August 4, 1933, the corporation, now named "Bruce Payne Company, Inc.", and Messrs. Bell, Buchanan, Crossman, Payne, and Rymer signed an agreement which consummated the negotiations. In this agreement the corporation offered to buy the shares of Bell, Crossman, and Rymer at a stated price of $75 per share, a portion of which was to be paid in cash. In the case of the plaintiff, the cash payment was to be in the amount of $5,000 and this sum was in fact paid to him by the corporation. The corporation was to give promissory notes to the stockholders for the remaining portion of the stated consideration. In the case of the plaintiff, the corporation agreed to give two notes: one for $10,000 due in 60 days, and one for $3,750 due in 120 days. Notes of this description were in fact executed and delivered to the plaintiff by the corporation.

The agreement as finally executed contained nothing to indicate that Bruce Payne was bound to or had offered to endorse any of the corporate notes, although he was a party to the agreement. On the reverse of each note are found the signatures "Grant L. Bell" and "Bruce Payne" handwritten in ink.

On November 15, 1934, the corporation, being in poor financial condition, made an assignment for the benefit of creditors.

Plaintiff filed no claim in the assignment proceedings and received no money as a result of that proceeding. In 1946, the corporation made a first and final liquidating distribution.

The corporate notes held by plaintiff were assigned by him to the Second National Bank of Wilkes-Barre as security for debts which he owed the bank. Crossman had assigned his notes to the same bank, and Rymer's notes were held by the First National Bank of Scranton.

The corporation made no payments on any of these notes. The plaintiff's notes were duly presented for payment and protest for non-payment was made. By reason of the appearance of Bruce Payne's signature on the reverse side of the notes, demands were made upon him for payment thereof, and he refused to pay. Thereafter, on August 2, 1939, the banks which held the notes began three suits against Bruce Payne, individually, for collection of the face value of the notes.

The First National Bank of Scranton case reached trial first, and the Court of Common Pleas of Luzerne County entered judgment for the defendant. An appeal was taken to the Supreme Court of Pennsylvania.

On May 22, 1944, the Supreme Court of Pennsylvania affirmed the judgment of the lower court. First National Bank of Scranton v. Payne, 349 Pa. 446, 37 A. 2d 568. On March 1, 1946, the remaining two cases were dismissed as controlled by this opinion.

The Supreme Court of Pennsylvania found that the agreement of August 4, 1933 specifically dealt with the subject of collateral security and that there was no suggestion in the agreement that Payne should become surety for the payment of the notes, and it further held that where an examination of a written contract shows that the agreement is apparently complete without any

uncertainty as to the object or the extent of the engagement, it will be conclusively presumed that the parties have put their whole engagement in writing and that, unless fraud, accident or mistake are averred, the contract will be so treated and parol evidence to add to or subtract from it will not be received. In short, the court held that Payne had never become an endorser of the notes and that he had never incurred any contractual liability because of his failure to become one.

The plaintiff duly filed his Federal Income Tax return for the year 1944 and the Income Taxes shown to be due thereon, in the amount of $2,592.84 were paid by the plaintiff. Subsequently, an audit was made of plaintiff's 1944 Federal Income Tax return, and an additional tax liability, in the amount of $1,146.03 with interest of $126.62, was assessed against the plaintiff, which sum was paid by plaintiff. Within the time prescribed by the Internal Revenue Code, plaintiff filed a claim for refund of the entire amount he paid as 1944 Federal Income Taxes, which claim for refund was denied by the Commissioner of Internal Revenue. The claim alleged that the notes in issue became worthless in 1944 by reason of the decision of the Supreme Court of Pennsylvania, and that he was therefore due a 1944 deduction in the amount of $13,750, which would wipe out his entire 1944 income and require recovery of the total tax paid for that year. Plaintiff had made no such claim previously. On the return as filed and as adjusted by audit, plaintiff claimed and was allowed a $1,000 capital loss deduction for the worthlessness of certain non-business bad debts. This deduction was allowed by reason of bad debts other than the alleged loss or bad debts involved in this action.

The question presented in this action is whether the deduction for the worthlessness of the notes in the year 1944 is to be allowed as an ordinary loss deduction under Section 23(e)(2) of the Internal Revenue Code, or as a capital loss deduction as provided by Section 23(k)

(4) in the case of losses due to the worthlessness of non-business bad debts.

Only if the allowable deduction is an ordinary loss deduction can plaintiff recover the tax paid for 1944, plus interest. If the worthlessness of the obligations in issue yields him only a bad debt deduction, he is not entitled to any recovery. Plaintiff had been allowed the legal limit of capital loss deductions for 1944, and a further deduction of this type affords him no refund of 1944 tax.

The relevant sections of the Internal Revenue Code contain the following provisions:

"§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions: * * *

"(e) *Losses by individuals.* In the case of an individual, losses sutained during the taxable year and not compensated for by insurance or otherwise— * * *

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * *

"(k) *Bad debts.*

"(1) *General rule.* Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *

"(4) *Non-business debts.* In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." (26 U.S.C.1946 ed., Section 23.)

The Internal Revenue Code provides that losses shall be deducted in one of two ways, if at all: either as ordinary losses, or as capital losses. Ordinary losses are deductible only to a limited extent in the year in which they occur; if any part of the deduction is left over, it is carried over into subsequent years.

■ Whether any particular loss is to be treated as an ordinary or as a capital loss depends upon the circumstances surrounding its origin and the particular portion of the Code devoted to its specific type. If there is a specific provision governing the deductibility of a specific type of loss, the taxpayer seeking a deduction for a loss of that type must look to that provision. He may not choose the general provision providing for the deductibility of losses not specifically mentioned elsewhere. If, for instance, a taxpayer buys a piece of land with the idea of selling it for a profit, and instead is forced to dispose of it at a loss for which he is not compensated by insurance or otherwise, he has certainly sustained a loss on a transaction entered into for profit, and his case fits Section 23(e)(2) precisely; yet he must take only a capital loss deduction because his case is dealt with more specifically by Section 23(g), which governs losses on the sale of capital assets.

(2) The conclusion to which this reasoning leads is that one of the conditions of deductibility under Section 23(e)(2) is that the loss under consideration must not be of a type specifically dealt with elsewhere in the Code. The sections of the Code dealing respectively with ordinary losses and non-business bad debts do not cover the same types of transactions, and are mutually exclusive in the sense that one transaction

cannot give rise both to a non-business bad debt deduction and an ordinary loss deduction. The making of the specific provision as to debts indicates that these were to be considered as a special class and that losses on debts were not to be regarded as falling under the preceding general provision. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200.

Plaintiff's contention is that he sustained a loss on a transaction entered into for profit. This of itself does not settle anything, except the fact that he is entitled to a deduction, which is conceded anyway. It does not tell the Court whether the deduction is a capital loss or ordinary loss deduction, which is the issue here. Plaintiff must also show that none of the specific limitations on Section 23(e)(2) apply.

The limitation applicable in this case is Section 23(k)(4). It is only necessary to ascertain whether the loss in question is deductible as a bad debt. If it is, no deduction may be had under Section 23(e)(2).

▆▆ The loss here is a bad debt. This loss is deductible in the year in which it clearly appeared that the notes were worthless. In order to show that a note is worthless the creditor must exhaust every reasonable means of collection. He must show that there was no hope of recovering anything from the debtor. If the notes are secured, he must show that he has realized all he can from the security. If it is endorsed or otherwise guaranteed, he must proceed against the party secondarily liable. The last is the situation here. Plaintiff was not entitled to take his bad debt deduction in the year in which the corporation became unable to pay, since, if we are to believe the plaintiff, there was then a reasonable expectation that Payne was liable as a guarantor. Plaintiff thereafter pursued the alleged guarantor, and failed to collect from him. When it became obvious that nothing could be recovered from Payne, it was patent that the debt of the corporation was not going to be paid. At that time the prerequisites to deductibility under the bad debt provisions were fulfilled, and the plaintiff became entitled to a bad debt deduction. Because the plaintiff was afforded a deduction under the bad debt provision, he cannot have one under the general loss provision.

Findings of Fact

1. In 1928 the plaintiff, Grant L. Bell, owned 250 shares of the Payne Coal Company stock which he had purchased for $100 per share.

2. On August 4, 1933, the corporation and Messrs. Grant L. Bell, R. H. Buchanan, A. W. Crossman, Bruce Payne, and Ralph W. Rymer signed an agreement in which the corporation, now named "Bruce Payne Company, Inc.", offered to buy the shares of Bell, Crossman, and Rymer at a stated value of $75 per share, a portion of which was to be paid in cash.

3. The plaintiff, Grant L. Bell, received a cash payment in the amount of $5,000 from the corporation.

4. The corporation executed and delivered two promissory notes to the plaintiff for the remaining portion of the stated consideration: one for $10,000, due in 60 days, and one for $3,750, due in 120 days.

5. On the reverse side of each note are found the signatures of "Grant L. Bell" and "Bruce Payne".

6. The agreement as finally executed contained nothing to indicate that Bruce Payne was bound to or had offered to endorse any of the corporate notes, although he was a party to the agreement.

7. The corporate notes held by the plaintiff were asssigned by him to the Second National Bank of Wilkes-Barre as security for debts which he owed the bank. A. W. Crossman had assigned his notes to the same bank, and Ralph W. Rymer's notes were held by the First National Bank of Scranton.

8. On November 15, 1934, the corporation being in a poor financial condition, made an assignment for the benefit of creditors.

9. Plaintiff filed no claim in the assignment for creditors proceedings and

received no money as a result of that proceeding.

10. The plaintiff's notes were duly presented for payment and protest for non-payment was made.

11. Demands were made upon Bruce Payne for payment of the notes, and he refused to pay.

12. On August 2, 1939, the banks which held the notes began three suits against Bruce Payne, individually, for collection of the face value of the notes.

13. In the case of First National Bank of Scranton v. Payne, the Court of Common Pleas of Luzerne County gave judgment for the defendant, from which an appeal was taken to the Supreme Court of Pennsylvania.

14. On May 22, 1944, the Supreme Court of Pennsylvania affirmed the judgment of the lower court, First National Bank of Scranton v. Payne, 349 Pa. 446, 37 A.2d 568, and on March 1, 1946, the remaining two cases were dismissed as controlled by this opinion.

15. The plaintiff duly filed his Federal Income Tax return for the year 1944 and the Income Taxes shown to be due thereon were paid by the plaintiff.

16. An additional tax liability was subsequently assessed against the plaintiff, which sum was paid by him.

17. Within the time prescribed by the Internal Revenue Code, plaintiff filed a claim for refund of the entire amount he paid as 1944 Federal Income Taxes, which claim alleged that the notes in issue became worthless in 1944 by reason of the decision of the Supreme Court of Pennsylvania, and that he was therefore due a 1944 deduction in the amount of $13,750, which would wipe out his entire 1944 income and require recovery of the total tax paid for that year.

18. On his original return as filed and as adjusted by audit, plaintiff claimed and was allowed a $1,000 capital loss deduction for the worthlessness of certain non-business bad debts other than the alleged loss or bad debts involved in this action.

From the foregoing Findings of Fact the Court concludes as a matter of law:

## Conclusions of Law

1. If there is a specific provision governing the deductibility of a specific type of loss, the taxpayer seeking a deduction for a loss of that type must look to that provision.

2. The sections of the Internal Revenue Code dealing respectively with ordinary losses and non-business bad debts do not cover the same types of transactions, and are mutually exclusive in the sense that one transaction cannot give rise both to a non-business bad debt deduction and an ordinary loss deduction.

3. Plaintiff must show that none of the specific limitations on Section 23(e)(2) of the Internal Revenue Code apply.

4. The limitation applicable in this case is Section 23(k)(4) and the loss here is a non-business bad debt.

5. In order to show that a note is worthless the creditor must exhaust every reasonable means of collection.

6. The prerequisites to deductibility under the bad debt provisions were fulfilled when it became obvious that nothing could be recovered from the alleged guarantor, Bruce Payne.

7. Because the plaintiff was afforded a deduction under the bad debt provision, he cannot have one under the general loss provision.

8. Since the deduction is a bad debt deduction, plaintiff is not entitled to any recovery. He had been allowed the limit of capital loss deductions for 1944, and a further deduction of this type affords him no refund of 1944 tax.

9. Judgment should be entered for the defendant.