In the Matter of ANCHORAGE BOAT SALES, INC., Debtor.

Bankruptcy No. 880–00884–17.

United States Bankruptcy Court, E.D. New York.

April 18, 1983.

Pinks, Feldman & Brooks by Bernard S. Feldman, Melville, N.Y., for trustee.

Paul Ades, Lindenhurst, N.Y., for Double L Realty.

DECISION & ORDER

BORIS RADOYEVICH, Bankruptcy Judge.

The debtor, Anchorage Boat Sales, Inc., by notice of motion filed January 7, 1983,

objects to the allowance of Claim # 44 in the amount of $74,716.82 in administrative expenses filed by Double L Realty Co. on September 2, 1982. The matter came on for trial March 14, 1983. At that time both sides submitted their proofs and decision was reserved. Based upon the evidence produced at said hearing the Court makes the following:

## FINDINGS OF FACT

1. Anchorage Boat Sales, Inc., (hereinafter "Anchorage") is a corporation founded in 1978 under the laws of the State of New York for the purposes of marketing and distributing watercraft. *See* Debtor's Schedules.

2. The principals of Anchorage were Louis DeFrisco and Leon Janis who each owned 50% of the stock of the corporation. As a result of the death of Mr. Janis on January 13, 1982, the estate of Leon Janis is presently the appropriate party in interest. *See* Debtor's Schedules and Finding of Fact # 2; *Citibank N.A. v. Anchorage Boat Sales, Inc.*, No. 880–00884–17 (Bankr.E.D. N.Y. dec. 21 July, 1980).

3. Double L. Realty Co. (hereinafter "Double L") is a partnership founded under the laws of the State of New York for the purpose of acquiring and supplying real estate space for Anchorage.

4. The partners of Double L were Louis DeFrisco and Leon Janis who each owned a one half interest in such partnership. Transcript of March 14, 1983 at 5, 8–9. (Hereinafter Tr. at " ")

5. In August of 1978 Anchorage commenced operations within the premises located at 189 West Montauk Highway, Lindenhurst, New York. Tr. at 29.

6. The premises mentioned in Finding of Fact # 5 are owned by Double L. Tr. at 20.

7. On February 22, 1980 Anchorage filed its Chapter 11 petition with this Court and commenced operation as a debtor-in-possession. Tr. at 21.

8. By order signed June 26, 1980, this Court appointed Donald S. Cohen to act as operating trustee of Anchorage.

9. Anchorage's petition was converted to a proceeding under Chapter 7 and Donald S. Cohen was appointed permanent trustee by order signed July 8, 1981.

10. Anchorage ceased operations and vacated the premises located at 189 West Montauk Highway, Lindenhurst, New York (hereinafter "the premises") sometime during December of 1981. Tr. at 18–19. *See* Claim # 44, annexed documentation.

11. During the period August of 1978 through February 22, 1980, no formal lease agreement existed between Anchorage and Double L.

12. Between February 22, 1980 and June 26, 1980, no lease agreement existed between the principals of Double L and the principals of Anchorage acting in their capacity as debtor-in-possession.

13. In the period June 26, 1980 to and including September 30, 1980 an oral month to month agreement existed between the trustee of Anchorage and the principals of Double L, under which Anchorage would pay $3,000 per month in rent for the premises. Tr. at 16, 64. The total liability accruing during this period was $9,000, of which $8,000 has been paid.

14. The agreement mentioned in Finding of Fact # 13 did not include an agreement to pay any tax or insurance charges. Tr. at 14.

15. In August of 1980 the trustee informed the principals of Double L that the $3,000 monthly rent was excessive and that he was going to terminate Anchorage's tenancy. At this time the parties entered into negotiations which resulted in an arrangement whereby the trustee agreed to pay an amount and upon occasion as the trustee in his discretion felt could be afforded by Anchorage. Tr. at 9–11, 16.

16. The principals of Double L waived their right to an administrative allowance for use and occupancy during the period Anchorage was operating under Chapter 11 by accepting the proposal of the trustee as set forth in Finding of Fact # 15.

17. During the period October 1, 1980 to July, 1981, the trustee paid Double L the sum of $8,275.00.

18. The reasonable value of Anchorage's use and occupancy of Double L's premises after its conversion to Chapter 7 is $3,000 per month. Multiplying this figure by the approximately six months it took to liquidate the debtor's estate (7/8/81—12/31/81), Anchorage's liability for use and occupation is found to be $18,000.

19. Anchorage, after its conversion to Chapter 7, made $8,000 in payments to the claimants which must be credited against any use and occupancy liability during the period July 8, 1981 through December 31, 1981.

## CONCLUSIONS OF LAW

1. Anchorage is contractually liable to Double L for rent in the sum of $1,000 for the period between July 1, 1980 through September 30, 1980.

2. Anchorage has no liability to Double L for rent or use and occupation for the period October 1, 1980 through July 8, 1981.

3. Anchorage is liable to Double L in the sum of $10,000 representing the unpaid balance for use and occupancy for the six month period that Anchorage occupied the premises after adjudication.

4. Anchorage is liable to Double L in the total sum of $11,000.

## MEMORANDUM

■ The filing of Double L's proof of claim raises the presumption pursuant to 11 U.S.C. § 502(a) and Bankr.Rule 301(b) that its claim is prima facia valid. Thereafter it is incumbent upon the debtor to come forward with evidence to controvert the claim as filed. The documentation annexed to Double L's claim reflects that its claim is contractual in origin. Anchorage has offered proof, through the testimony of its operating trustee, indicating that no leasehold agreement existed between Anchorage and Double L with the exception of the three month period between July through August of 1980. The trustee's testimony

was sufficiently clear and convincing to negate any presumption which the claimant may have enjoyed under Rule 301(b). Thereupon it was incumbent upon Double L to prove its claim by a fair preponderance of the evidence. *See In re Avien,* 390 F.Supp. 1335 (E.D.N.Y.1975); *In re Gorgeous Blouse Co.,* 106 F.Supp. 465 (S.D.N.Y. 1952). *In re Cavanagh Communities Corp.,* 3 B.C.D. 967 (Bankr.S.D.N.Y.1977).

The claimant alleges that the initial occupancy of the premises was conditioned upon payment of rent pursuant to an oral leasehold agreement, wherein the debtor agreed to pay monthly rent of $4,000 plus additional rent in the form of real property taxes and insurance. It is asserted that the obligation was assumed by the debtor-in-possession (hereinafter DIP) through June of 1980, and that thereafter the principals of Double L and the trustee agreed to a reduced rent of $3,000 plus taxes and insurance.

The trustee admits that he agreed to pay $3,000 per month rent during the period of July through September, but denies any contractual liability for taxes or insurance. Tr. at 16, 27. It is asserted by the trustee that the parties agreed to an arrangement whereby the trustee, commencing October 1, 1980, would pay rent only when, and in an amount, he deemed provident.

In establishing the validity of this claim, it must first be determined whether a prepetition lease existed wherein Anchorage was to pay Double L $4,000 a month rent plus taxes and insurance. Though this is not in direct dispute as an element of the claim being litigated, its existence is the foundation upon which the claimant bases his demand for $4,000 a month rent for the period between March through June 1980, and for approximately $40,991.82 in allegedly outstanding tax and insurance charges.

■ Upon the record presented, this Court can not find that such a pre-petition agreement existed. The claimant testified that the pre-petition and DIP lease were oral. While the existence of such an agreement is factually and legally possible, this

Court would be reluctant to make such a finding based upon the facts of this case, absent strong corroborative proof. A conspicuous and important consideration behind requiring some independent proof of the alleged lease is necessitated by the fact that the principals of the debtor and the landlord are identical. While there is nothing inherently invidious in such a situation, it is established law that the dealings of insiders with their corporation are subject to rigorous scrutiny, and that the challenge of their contracts places the burden upon the insider to prove both the good faith and fairness of the transactions. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1921); *In re Club Dev. & Management Co.,* 27 B.R. 610, 10 B.C.D. 199 (Bkrtcy.App.Pan. 9th Cir.1982). This Court is well aware of the opportunities which tempt the principals of interlocking businesses to forsake and loot the bankrupt estate in an effort to enhance their personal interests. This tendency becomes particularly acute when no writings exist to document an agreement which is allegedly recorded only in the minds of the principals who represent both entities. *See* Tr. at 32.

In the case at bar, the claimant has failed to introduce any evidence which indicates that a monthly pre-petition rent payment of $4,000 was ever made. This Court's independent scrutiny of the exhibits annexed to Double L's pre and post petition claims, No. 47 and No. 44 respectively, reveals the fact that Anchorage did not pay any rent whatsoever after August of 1979, and that it never paid any real property taxes on the premises. Tr. at 37. It is noted that during the period, February 22, 1980 to July 1980, while Anchorage operated as a DIP, the claimants did not charge Anchorage any rent until proceedings to appoint an operating trustee had been initiated. Tr. at 47. Upon the record presented, this Court can not find that a pre-petition or DIP lease agreement existed.

The next issue is whether the trustee ever agreed to pay real property taxes and insurance premiums in addition to monthly rent. Both sides admit they entered into an oral leasing arrangement in July of 1980, wherein Anchorage was to pay $3,000 monthly. Tr. at 24, 38. The claimant alleges that in addition to the monthly rent, the trustee agreed to pay the taxes and insurance on the premises. The trustee denies this.

■ This Court has already found that no pre-petition or DIP agreement to pay taxes and insurance existed. Accordingly this Court will not accept the contention that the trustee assumed the prior agreement in toto, with the only modification being a $1,000 decrease in rent. It is incumbent upon the claimant to affirmatively prove the alleged additional components of his subsequent bargain. The claimants have failed to meet this burden.

The claimant admits that the terms of the July 1980 agreement were reduced to writing in a confirmatory letter. Tr. at 24. If the additional charges were truly to be paid by the debtor, this provision would have been included in this writing which the claimant failed to offer into evidence. Tr. at 43. Additionally this Court notes that the claimant never made a written or oral demand on the debtor to pay the taxes, nor did the debtor ever make a tax payment. Tr. at 56. It is hard to believe that individuals who are well versed in the ways of business would have no records to substantiate the existence of such a significant obligation. Upon the record herein this Court finds that the trustee did not agree to pay taxes or insurance charges on behalf of the debtor.

The last determination to be made is whether the trustee effectively terminated the leasing arrangement he entered into in July of 1980. The trustee testified that in August of 1980 he decided that Anchorage could not afford $3,000 a month rent, and that accordingly he gave notice to Double L that he was going to reject the lease and relocate. Tr. at 9–11. The claimant contends that no such termination ever took place, and that Anchorage is liable for $3,000 per month rent up through December of 1981.

In deciding a factual issue wherein the evidence is limited to one man's word against that of another, the credibility of either side is dependent upon the consistency of his story as applied within the framework of the undisputed facts. In this case the trustee's version of events is more clearly consistent with the established facts.

One need only look at the docket and schedules of this case to realize the desperate financial position of this debtor. It is entirely reasonable to believe the trustee's contention that this debtor could not afford to regularly pay rent. It is likewise believeable that the trustee would suggest, and Double L would acquiesce to an arrangement whereby the trustee would continue operating the debtor on the premises and would pay rent only if and in an amount he deemed feasible. It was in the principals' pecuniary interest to keep the Anchorage reorganization effort viable as they, and the other entities they controlled, were personally liable as guarantors of the debts of Anchorage. Tr. at 71–74. *See also* Finding of Fact # 5, *Midlantic Nat. Bank v. Anchorage Boat Sales Inc.,* (Bankr.E.D. N.Y. Dec. June 16, 1980).

The trustee's story is likewise consistent with the claimant's exhibits and with the operation of New York law. The trustee gave notice of his intention to terminate the oral lease in August of 1980. As an oral lease wherein the tenant makes monthly payments is presumed to be a month to month tenancy, the trustee was obligated to pay rent through September. *See* N.Y.R. P.L. § 232–b. The claimant's exhibits substantiate this as they indicate that September's rent payment was the full $3,000, and that thereafter Anchorage's payments were intermittent $2,000 payments.

These acknowledged $2,000 payments are also the most glaring weakness in the claimant's case. If the rent was $3,000 a month, why was Double L accepting $2,000 a month without protest? It is also admit-

ted that claimant never invoiced the trustee for any outstanding rent. Tr. at 44, 52. *See* also 59. Additionally, the claimant has never requested an order from this Court directing the debtor to honor its rental obligations, even though the claimant has constantly monitored and participated in this case. This assemblage of facts can only be construed to affirm the trustee's position.

Lastly, this Court will consider the interest of either party in the outcome of this matter. The claimant obviously stands to financially benefit as it is apparent that there will be a payment on account of administration claims. The trustee has no personal stake in this litigation, and therefore has little incentive to deviate from the truth.

■ The Court finds that the lease agreement of July 1980 was properly terminated in September of 1980. The debtor is contractually liable to Double L for the $9,000 of charges which accrued during the tenure of this agreement. As the claimants' exhibits indicate the debtor paid $8,000 during the lease period, the debtor owes only $1,000 on this portion of the account. The proposition that the debtor can not be bound by this lease as it was not Court sanctioned is without merit.[1] When the trustee contracted for a month to month lease, he was proceeding pursuant to the powers vested in him under 11 U.S.C. §§ 363(c) and 364(a). The monthly decision of whether to continue occupancy is sufficiently within the ordinary course of business so as not to require prior approval by this Court.

■ Upon the lease's termination in September of 1980, it was replaced with an arrangement which left rent payments solely within the discretion of the trustee. As such an arrangement tenders no consideration recognizable under the law of New York, no contractual liability accrued

---

1. Equally meritless is the argument that § 365 of the Code requires this case to be decided solely upon the basis of use and occupancy unless the lease assumption was approved by this Court. There was no need for the trustee to get prior court approval to effectuate this lease as it has already been established that there existed no pre-petition lease for the trustee to assume or reject.

against Anchorage in the period October 12, 1980 to July 8, 1981. *See Hathaway v. Bennett,* 10 N.Y. 108 (1854); *Eastern Transp. Co. v. Blue Ridge Coal Co.,* 159 F.2d 642 (2d Cir.1947).

■ The debtor's reorganization having failed, the claimant now seeks additional compensation in the nature of an allowance for use and occupancy. With respect to the Chapter 11 period from the termination of the lease, September 30, 1980, through the date of Anchorage's conversion to Chapter 7 on July 8, 1981, this Court finds the claimant waived its right to use and occupancy. Waiver is defined as the voluntary and intentional relinquishment of a known right or advantage. *See Hadden v. Consol. Edison Co.,* 45 N.Y.2d 466, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978). During this stage of the debtor's attempted reorganization, the claimants waived any use and occupancy charges in exchange for the trustee's discretionary $2,000 payments and continued operation of Anchorage. The motive for this waiver being the claimant's recognition that to burden Anchorage with this administrative expense would surely doom any hope of a successful reorganization, thereby forcing them to make good on their guarantees of Anchorage's debts. The claimant's relinquishment of the debtor's occupation liability is best viewed as an indirect infusion of working capital. It is clear that the claimant would not have sought reimbursement of this expense if Anchorage successfully reorganized. Having initially stood in the guise of an investor, it would be inequitable to allow the claimant to change its status to that of an administrative creditor.

The trustee's argument that the involved waiver included the liquidation stage of this case is rejected. From the debtor's adjudication in July of 1981 to its vacating the premises in December of 1981, the claimant received no benefit from Anchorage's use and occupation of its premises. Absent such benefit the record will not support a finding of waiver during the period July, 1981, through December, 1981.

■ The trustee's argument that the claimant is not entitled to use and occupancy due to its failure to bear the burden of proving it is also rejected. Though there was no direct testimony as to the value of the debtor's use and occupancy, there is sufficient proof in the record that both the trustee and the claimant at one point recognized the rental value of the premises to be $3,000 per month. This is the factor upon which an allowance of $3,000 a month use and occupancy may be based. *See S. & W. Holding Co. v. Kuriansky,* 317 F.2d 666 (2d Cir.1963); *In re Diversified Services, Inc.,* 369 F.2d 93 (5th Cir.1966); *In re CRS Archit. Metals Co.,* 1 B.R. 729 (Bkrtcy.E.D.N. Y.1979); *In re Datamation Services,* 1 B.C.D. 1698 (Bankr.S.D.N.Y.1975).

The total use and occupation charge which accrued during the six month liquidation stage of this case is $18,000. This figure must be reduced by the $8,000 in payments made by the trustee during this period. Adding to this the $1,000 still due and owing under the aforementioned lease, the claimant's administrative claim is allowed in the sum of $11,000.[2]

Settle judgment in accordance herewith.

---

2. It is noted that should there be insufficient funds to pay all administrative claims, $10,000 of this figure is to be designated a Chapter 7 administrative expense and $1,000 a Chapter 11 administrative expense. *See* 11 U.S.C. § 726(b).