**In re G. MARINE DIESEL CORP., Debtor.**

**Bankruptcy No. 891–81973–478.**

United States Bankruptcy Court, E.D. New York.

July 16, 1993.

Barry R. Feerst, New York City, for debtor.

Birzon & Sobel, Smithtown, NY, for Anfrank Metal Fabricating Industries, Inc.

DECISION ON DEBTOR'S MOTION TO EXPUNGE CLAIM FILED BY ANFRANK METAL FABRICATING INDUSTRIES, INC.

DOROTHY EISENBERG, Bankruptcy Judge.

This contested matter comes before the Court upon the Debtor's objection to the claim filed by Anfrank Metal Fabricating Industries, Inc. ("Creditor") against the estate for services rendered and materials furnished as subcontractor to the Debtor pursuant to the Debtor's general contract with the U.S. government.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334. This matter constitutes a core proceeding under 28 U.S.C. 157(b)(2)(A), (B) and (O).

## II. FACTS AND BACKGROUND

The Debtor, G. Marine Diesel Corp. ("Debtor"), is engaged in the business of large ship repair. Throughout the Spring and Summer of 1990 the Debtor was acting as general contractor for the repair and refurbishing of several ships of the United States Navy. During that period the Debtor employed the services of the Creditor as a subcontractor for the fabrication and installation of certain ventilation systems on Navy ships.

The Debtor filed a petition for relief under Chapter 11 of the Code on May 8, 1991 and continued operations as a debtor-in-possession. On July 2, 1991 the Creditor filed a claim against the estate in the amount of $298,763.20, Two Hundred–Ninety Eight Thousand, Seven Hundred Sixty Three Dollars and Twenty Cents, for prepetition invoices dated between June 11, 1990 and February 4, 1991 representing unpaid services rendered and materials furnished in connection with the repair of certain Navy ships, the U.S.S. Butte and the U.S.S. Los Alamos.

The original contract price for labor, material and services for the ships in question was paid in full to the Creditor. This claim is for additional labor, material and services required based on change orders, design changes, and acceleration costs. The Debtor filed the instant motion to reduce or expunge the Creditor's claim alleging that a significant portion of the claim represented either work which was not authorized or work which was invoiced at excessive wage rates. On three separate hearing dates the parties presented evidence in the form of numerous documents and the testimony of several witnesses.

For the reasons which follow the Court finds that the Creditor's claim should be reduced to $153,358.67 and allowed as an unsecured claim in that amount.

## III. STANDARDS AND AUTHORITIES

A proof of claim properly executed and filed constitutes "prima facie evidence of the validity and amount of the claim."

Bankruptcy Rule 3001(f). Such a claim is "deemed allowed" unless a party in interest objects. 11 U.S.C. 502(a). If such an objection is made, the Court, after notice and a hearing, shall determine the amount of the claim.

11 U.S.C. 502(b).

[1] Because a properly executed and filed claim is deemed allowed, the objecting party has the initial burden of producing sufficient evidence to rebut the claimant's prima facie case. *Simmons v. J.T. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir.1985); *Global Western Development Corporation v. Northern Orange County Credit Service, Inc.*, 759 F.2d 724, 727 (9th Cir.1985); *In re Gorgeous Blouse Co., Inc.*, 106 F.Supp. 465 (S.D.N.Y.1952).

■ If the objecting party sufficiently rebuts the claimant's prima facie case, the burden shifts back to the claimant as it is ultimately "for the claimant to prove his claim, not for the objector to disprove it." 106 F.Supp. at 465; *Accord, In re Anchorage Boat Sales, Inc.*, 29 B.R. 275, 277 (Bankr.E.D.N.Y.1983). Collier succinctly summarizes the procedure as follows:

"In short, once the prima facie effect given the claim is overcome, the burden of ultimate persuasion rests on the claimant to prove that his claim is appropriate for purposes of sharing in the distribution of the debtor's assets. That proof must be by a **preponderance of the evidence** and it is for the bankruptcy judge to determine whether or not that has been achieved, with due regard being given to the probative value of the proof of claim itself." (emphasis added) (footnote omitted).

Collier on Bankruptcy § 502.02, p. 502–22—502–23.

The Court finds that the proof of claim submitted by the Creditor was properly executed and filed and thus, stands as prima facie evidence of the Creditor's claim. Accordingly, the initial burden belonged to the Debtor to rebut the presumption that the claim is valid. Although the Debtor raised numerous objections, these objections essentially fall into three categories: (1) unwarranted charges for interest on the unpaid debt; (2) unauthorized and unnecessary charges for post-contract re-engineering due to the Creditor's claim of being provided with inaccurate and/or deficient specifications; and (3) an excessive claim for wages paid pursuant to the Navy's demand for acceleration. For the sake of clarity, each category will be considered separately.

### A. Interest

■ First, the Debtor notes that the amount reflected on the Creditor's statement of account exceeds the total of the underlying invoices by approximately $28,277. No explanation is provided on the statement of account. However, as became clear at the hearings, this amount represents a claim for interest on the unpaid invoices. The Debtor argued that no contract existed between the parties which provides for such interest charges. The burden then shifted to the Creditor, who was unable to justify the interest charges. It is clear that the creditor had no contract or agreement with the Debtor for payment of interest. This Court finds that this was a unilateral determination to impose a charge for interest made by the creditor without any evidence to support its claim for the payment of interest. Accordingly, interest charges of $28,277.78 will be deducted from the Creditor's claim.

### B. Equitable Adjustments

The remaining objections by the Debtor could not be resolved by mere reference to the Creditor's claim and underlying documentation. These objections had to do with charges on the invoices which exceeded the original bid by the Creditor. However, due to peculiarities in the nature of government contracts, some background is necessary.

■ It is well settled that in a contractual relationship involving the government and a contractor, the government has the right to order changes in the contractor's work throughout the period of performance. *See,* Anderson, David G., *Recovery of Indirect Costs: Pricing of Equitable Adjustment Terminations for Conve-*

*nience,* ABA Sec. of Public Contract Law at 7 (1989). Such changes constitute cause for equitable adjustments in the contract price which are used as corrective measures to keep a contractor whole. *Bruce Construction Corp. v. United States,* 163 Ct.Cl. 97, 324 F.2d 516 (1963).

In the instant case the Creditor alleges two causes for such equitable adjustments. First, the Creditor argues that the specifications provided by the government were deficient thus causing a substantial increase in the cost of completing the project by virtue of necessary re-engineering and other changes in materials or labor in order to provide the appropriate manufacture of parts and proper installation. Approximately $160,000 of the Creditor's total claim is attributable to such costs. Second, the Creditor argues that the government's acceleration order caused the Creditor to incur substantial additional costs of approximately $110,000.

### Deficient Specifications

■ Most of the invoices for changes requested by the Creditor were approved by the Government. Some were not transmitted by the contractor to the Government for approval, or if they were, were not responded to as approved or not approved. However, there is no claim that the services and materials were not provided. The issue is whether they are to be paid as appropriate changes, or denied payment because the labor or services were not necessary or were duplicate services for those which were to have been included in the original bid and contract between the parties.

"A contractor attempting to perform to defective specifications may be entitled to costs incurred in attempting to meet the requirements of the original specifications, as well as the costs resulting from the mistakes in the plans." E. Massengale, *Fundamentals of Federal Contract Law* at 124 (1991).

Based upon the evidence presented at the hearings, this Court is satisfied that the specifications provided by the government were deficient. It is clear that in large part this deficiency was due to the fact that the drawings or blueprints presented to the Creditor were outdated and did not reflect numerous changes to the structures which had been made over the years. The fabrication and installation work performed by the Creditor required precise measurements which in the Court's view could not be performed with the drawings provided. Although the original bid price includes shop drawings based on the plans and specifications provided to the subcontractor by the contractor, it does not include the cost of new or additional drawings required as a result of errors from the original plans provided to the subcontractor creditor.

Mr. Sklaro, the contracting officer for the government for ships in the Brooklyn Navy Yard, testified that one of the ships at issue, the Los Alamos, had had a complete overhaul in 1979–1980 and the ship's original drawings were not corrected to include changes from the overhaul. Therefore, the original drawings provided to the creditor by the Debtor do not reflect the vessel as it existed at the time of the instant contract.

The portion of the Creditor's claim attributable to necessary changes due to defective or erroneous specifications is a total of $161,208.67. Many of the invoices for change orders included sums incurred for necessary engineering changes which should be allowed. However, item no. 512–80–002, Report #2 Engineering, included a charge for $47,050 representing "re-engineering" charges and $9,496 for fabricated pieces which were unusable as a result of the faulty specifications. It appears that approval for these charges by the government was never obtained, and the Court is not convinced that the charges for "re-engineering", which are in dispute, were either necessary or authorized by the Debtor or the Government. These "re-engineering" charges appear to be either duplicated charges or an unnecessary additional charge. Therefore, the claim will be reduced by the sum of $47,050.

### C. *Acceleration Costs*

■ During performance of the work underlying the instant claim, the government

issued an acceleration order which resulted in decreasing the time period for completion of the work from approximately three months to approximately one month. Such an acceleration order entitles a subcontractor to an equitable adjustment in the contract price. Alston, F., Worthington, M., & Goldman, L., *Contracting with the Federal Government,* at 332 (3rd Ed., 1992). An equitable adjustment in this instance is defined as the difference between what it would have cost to perform the work pursuant to the contract and what it reasonably cost to perform the work as changed. Nash, R., Jr. & Cibinic, J., Jr., *Federal Procurement Law, Vol. II* at 1364 (3d Ed. 1980), *citing Appeal of Modern Foods, Inc.,* ASBCA 2090, 57–1 BCA 1229, 1957 WL 4960 (1957).

■ Due to the acceleration order in the instant case the Creditor claims to have incurred total wage costs in the sum of $183,017.00 for the period of May 22, 1990 through June 22, 1990 (the "Accelerated Period"). The Creditor has applied some payments to the wage cost and has included only the sum of $109,276.75 as additional acceleration costs in its proof of claim. The Debtor strongly objects to this figure claiming that the Creditor did not properly distinguish the premium or acceleration costs, for which additional fees are due, and the base costs which remained the responsibility of the Creditor due to the original bid. The Debtor argues that the base costs were improperly included in the acceleration invoices. The Creditor responds that none of the invoices submitted as part of the acceleration claim include base costs which were omitted from the invoices.

After reviewing the evidence in this case, the Court has no doubt that the invoices presented by the Creditor represent actual work performed. However, in the Court's view the Debtor has successfully rebutted the presumption of validity regarding this portion of the Creditor's claim by raising an issue as to how base costs were distinguished from acceleration costs. Therefore, the burden of proof shifted to the Creditor to justify this portion of the claim by a preponderance of the evidence.

While the Court does not accept the view of the Debtor that the vast majority of the invoices represent base costs incorrectly billed as acceleration, or premium, costs, the Debtor's argument does highlight a deficiency in the Creditor's method of bookkeeping. Based upon the testimony of Frank Gardini on behalf of the Creditor, the Creditor's base costs prior to acceleration included at least seven workers at $35.00 per hour for eight hours a day, five days a week. Mr. Gardini further testified that prior to acceleration the remaining work was projected to require approximately three months.

The acceleration required the Creditor to add additional laborers and maintain shifts around the clock in order to perform the necessary work in the shortened period of time. After acceleration, Mr. Gardini claims not to have charged for the base hours due to the pre-acceleration bid, however, there is no indication of how those hours were credited when approximately two months were removed from the anticipated contract period. Put simply, the Creditor should have estimated its anticipated normal cost to complete the work and applied a credit in that amount against the actual costs incurred during acceleration. This would have clearly distinguished base costs, which were the responsibility of the Creditor, from acceleration costs, for which the Creditor could justify additional charges.

If the Creditor was initially obligated to incur costs based on seven workers at eight hours per day, five days per week for twelve weeks, at the rate of $35.00 per hour, the remaining "man-hour" base cost would have been $117,600. When the remaining contract period was shortened from three months to one month, assuming the pre-acceleration crew to have continued working forty hour weeks, two months worth of "man hours" should have been credited against the increased costs incurred during the month of acceleration. Doing so should have resulted in a credit of $78,400 for two months of base "man-hours" performed within one month. But, it does not appear that the Creditor did so.

Rather, the Creditor points to the fact that it did not charge for the base workers for the one month acceleration period and reduced its "straight time" fee for the additional laborers employed by ten dollars per hour. Unfortunately, it appears from the invoices that the Creditor's omission of base pay only applied to the first eight hours per day per worker, referred to as "straight time" for one month. Such a credit alone leaves two months of basic "man hours" to be credited, or $78,400 for two months of "man-hours" which was included in the original bid, but not credited. The amount due and allowed for acceleration costs is therefore $39,200.

The Court is cognizant of the fact that some additional sums could easily have been attributable to increased overhead or administrative expenses or even lost profit due to the acceleration.

However, the method employed by the Creditor to calculate the appropriate credit for non-acceleration base charges prevents the Court from allowing this sum requested because there are no records to justify such an allowance. *See, Federal Procurement Law* at 1385, *citing, Appeals of Baifield Industries, Div. of A–T–O, Inc.,* ASBCA 13418, 77–1 BCA p12, 308, 1976 WL 2080 (1976).

## IV.  CONCLUSION

Based on the foregoing reasons, the claim against the Debtor's estate by the Creditor herein shall be reduced by $28,277.78 as a result of unauthorized, noncontractual interest charges; shall further be reduced by the amount of $47,050 due to unauthorized and unnecessary "re-engineering charges"; and by the amount of $70,076.75 as a result of the Creditor's miscalculation of, and failure to substantiate, certain acceleration costs, for a total reduction of $145,404.53.

The Creditor's claim shall be reduced to the sum of $153,358.67 which shall be allowed as an unsecured claim and paid pursuant to the distribution authorized by the Debtor's confirmed Plan of Reorganization.

Settle an Order in accordance with this Decision.