**In re G. MARINE DIESEL
CORP., Debtor.**

**Bankruptcy No. 891–81973–478.**

United States Bankruptcy Court,
E.D. New York.

March 27, 1996.

See also, 155 B.R. 851.

Barry R. Feerst, New York City, for the Debtor.

Zumbrunn & Hand by Werner J. Zumbrunn, Babylon, New York, for General Marine Industries, Inc.

---

### DECISION ON DEBTOR'S MOTION OBJECTING TO CLAIM FILED BY GENERAL MARINE INDUSTRIES, INC.

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is the motion of the debtor, G. Marine Diesel Corp., (the "Debtor") objecting to the claim filed by General Marine Industries, Inc. ("GMI") against the estate for services rendered and materials furnished as a subcontractor to the Debtor. This Court held hearings to consider the objection on March 17, May 22, and September 8, of 1995 at which both parties presented documentary, as well as testimonial evidence. The parties also filed post-hearing memoranda. For the reasons set forth below, the Court concludes that GMI's claim shall be allowed in the sum of $214,217.79 as an unsecured claim.

### FACTS

The Debtor is in the business of renovating and repairing large ships. In late 1989 and early 1990, the Debtor was serving as the general contractor for the refurbishment project of several warships of the United States Navy ("Navy"). During that period the Debtor entered into a contract with GMI under which GMI was to serve as a subcontractor on the Navy project. GMI was to provide, among other work, installation of piping, removal of asbestos, tiling, ventilation system repair and related work on Navy vessels docked at the Brooklyn Navy Yard, to wit, the U.S.S. Nitro, the U.S.S. Bogalusa and the U.S.S. Los Alamos. Evidence adduced at the hearings established that the Debtor was an experienced prime contractor with the Navy and that GMI, though experienced in ship repair on Navy projects, was usually a prime contractor for Navy projects and was not often in the position of subcontractor.

The Debtor's Program Manager for the project was Michael Alloway ("Alloway"). Alloway routinely dealt with Robert Debona ("Debona"), GMI's Local Area Manager, in the course of the Debtor's management of the renovation work. Bruce Taylor ("Taylor"), the president of GMI, was personally involved, but relied heavily in the day to day business on his agent Debona, in supervising the project.

GMI commenced work on the Navy project sometime in October of 1989. Soon after beginning work, GMI encountered difficulty in obtaining payment from the Debtor; payments were not made in a timely or regular fashion. In order for GMI to receive payment, Taylor testified, he was to submit progress invoices to Alloway by 12:00 p.m. on each Monday followed by a meeting at which the parties would discuss the work and payments, if they were forthcoming, were to be made soon thereafter. The essence of this arrangement was documented and conveyed between the parties via correspondence between the Debtor and GMI in October, 1989. (GMI's Exs. 16 and 22). In reality, according to Taylor, he often provided the invoices by Friday of the prior week, Alloway did not conduct meetings at all and payments by the Debtor were sporadic at best. The evidence demonstrates clearly that the Debtor failed to hold the weekly meetings to review the progress invoices. Instead, Alloway took the invoices from Taylor, advised GMI to continue work and usually took no further action beyond making some periodic, albeit insufficient, payments after GMI proceeded with the work.

By letter dated December 16, 1989 Taylor advised the Debtor of the gravity of the situation. (GMI's Ex. 17). Citing the Debtor's outstanding bill for, at that time $173,883.38, the Debtor's consistent delinquency in making payments against submitted progress invoices, GMI's inability to meet payroll and thus, to make progress payments to subcontractors and the fact that one subcontractor had already stopped work on the job, Taylor informed the Debtor that it was discontinuing work as of December 17, 1989 but would

return to the job immediately upon receipt of the overdue payments. On December 17th GMI walked off the job and instructed its subcontractors, Generation Refrigeration Inc. (the labor subcontractor) and Maritime Equipment Inc. (the material supplier), to leave the job as well. On February 5, 1990 Taylor wrote a letter to Alloway detailing GMI's final invoice to the Debtor for total outstanding payments of $314,212.81 constituting work performed on the three ships as follows: (1) U.S.S. Nitro $279,372.29; (2) U.S.S. Bogalusa $31,440.52; and (3) U.S.S. Los Alamos $3,400.00. (GMI's Ex. 20).

On May 8, 1991 the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code and thereafter, continued operations as a debtor-in-possession. On November 25, 1991 GMI filed an unsecured non-priority claim against the estate in the amount of $230,360.69 for pre-petition work and services performed by GMI in connection with the repair of the Navy ships. GMI filed an amended unsecured non-priority claim in the amount of $314,212.81 on March 16, 1993. As explained below, a large portion of GMI's claim are charges referable to additional labor and materials furnished based on "growth work."

The Debtor filed the instant motion to reduce or expunge GMI's claim on January 28, 1993. This motion also applies to this claim as amended by GMI after the motion was filed.

Prior to the filing of Debtor's petition, GMI sued the Debtor in the Supreme Court of the State of New York, County of New York, for recovery of costs regarding work and supplies rendered in connection with the Navy project. According to GMI, the basis of that suit is based on a similar claim to the one filed by GMI in this Court. However, in the state action, Debtor counter-claimed against GMI, claiming that the work performed by GMI was incomplete and improperly performed and that some materials were defective. GMI commenced a third party action against its labor contractor (Generation Refrigeration) and its material supplier (Maritime Equipment) arguing that if GMI was liable to the Debtor on the Debtor's counterclaim, then Generation Refrigeration

and Maritime Equipment would be liable to GMI on the same grounds. Generation Refrigeration is not a party to this contested matter. Further, GMI will receive on its allowed claim only 16 cents on the dollar pursuant to the Debtor's confirmed plan of reorganization. This Court has no jurisdiction over the third party, or over the amount that may be due to any of them pursuant to that third party action.

At the hearing conducted on March 17, 1995, this Court, finding that the sum of $99,995.02 was the subject of the state court dispute between the Debtor, GMI and Generation Refrigeration, reduced GMI's claim by that sum without prejudice and left that portion of the claim to be decided by the state court. If the state court determines that any money is due to GMI from the Debtor, that sum will then become payable pursuant to the confirmation order in this case. Therefore, the starting figure for this Court's analysis is $214,217.79.

█ To understand fully the dispute at bar some further background about the peculiar nature of government contract work must be reviewed. As this Court has seen previously in a similar matter, in contractual relationships involving the government and a contractor, the government has the right to order changes in the contractor's work throughout the period of performance. *See In re G. Marine Diesel Corp.*, 155 B.R. 851, 853–54 (Bankr.E.D.N.Y.1993) (citation omitted). In some instances, especially on large government projects, the contractors discover that changes to the original work plan are necessary. Generally, these changes result in modifications to the materials needed and man power necessary to complete the job.

In this case, both the Debtor and GMI fully understood the potential for "growth work" during the course of the Navy project. The term "growth work" describes an expansion (from the work originally contracted) of the scope, time required and cost of the work as repairs progress (hereinafter referred to as "growth work" or "change orders"). To account for this possibility the Debtor and GMI agreed upon a procedure to present the modifications to and obtain approval from the Navy. GMI was to document in writing to

the Debtor the necessary changes in scope, time and cost. In turn, the Debtor was to negotiate the necessity and cost of the proposed changes with the Navy. Finally, if the modifications were approved by the Navy, within four to six days the Debtor was to give to GMI a change order authorizing the work. If the Navy did not agree to the changes then GMI was told not to perform the requested changes. To some degree, this procedure was embodied on the Debtor's initial form purchase order under the heading "Pricing and Conditions," where the following clause stated:

> The Sub–Contractor/Vendor is authorized to Perform/Supply the requirements the [sic] Purchase Order, including Fixed Price Agreements, no additional work nor additional material/supplies will be provided/performed without an Amendment to this Purchase Order. In the event of performing work on an Original Item the Sub–Contractor discovers that a request in deviation from the Original Item is required the Sub–Contractor is required to provide a report with a Cost Breakdown Attachment [sic]. The Sub–Contractor shall not proceed to provide/perform prior to his receiving modification to this Purchase Order.

(GMI's Ex. 1). However, this Court finds that in this case, in practice, this process was rarely, if ever, followed.

## DISCUSSION

A proof of claim that is properly executed and filed constitutes "prima facie evidence of the validity and amount of the claim." Fed. R.Bankr.P. 3001(f); *In re Tesmetges,* 87 B.R. 263, 270 (Bankr.E.D.N.Y.1988), *aff'd,* 95 B.R. 19 (E.D.N.Y.1988). A claim is "deemed allowed" unless a party in interest objects. 11 U.S.C. § 502(a). If such an objection is made, the court, after notice and a hearing, shall determine the amount of the claim. 11 U.S.C. § 502(b).

Because a properly executed and timely filed claim is deemed allowed, the initial burden rests on the objecting party to produce sufficient evidence to rebut the claimant's *prima facie* case. *G. Marine Diesel Corp.,* 155 B.R. at 853 (citing *In re Simmons,* 765 F.2d 547, 552 (5th Cir.1985)). If the objecting party sufficiently rebuts the claimant's *prima facie* case, the ultimate burden shifts back to the claimant to prove the claim. *See In re Bagnato,* 80 B.R. 655, 658 (Bankr.S.D.N.Y.1987); *In re Anchorage Boat Sales, Inc.,* 29 B.R. 275, 277 (Bankr.E.D.N.Y. 1983). The claimant must prove its claim by a fair preponderance of the evidence. *Tesmetges,* 87 B.R. at 270; 3 *Collier on Bankruptcy* ¶ 502.02, at 502–22 (15th ed. 1995).

This Court finds that GMI's proof of claim was properly executed and timely filed and therefore, stands as *prima facie* evidence of GMI's claim. Accordingly, the Debtor, as the objecting party, carries the initial burden to rebut the presumptive validity of GMI's claim.

The Debtor's objections fall into two general categories: (1) GMI failed to follow the guidelines for obtaining Navy approval of growth work and thus, performed unauthorized work; and (2) various complaints that can collectively be called billing disputes for additional charges. Because of these defects, the Debtor argues that the maximum claim GMI can assert is for $131,881.92.

### A. *Unauthorized Work*

The agreed upon procedure to obtain Navy approval of the growth work lies at the heart of this controversy. The Debtor argues that GMI did not follow the requisite outlined steps and proceeded to perform work that was not first authorized by the Navy, GMI contends that the Debtor failed to adhere to its own directions and informed GMI to proceed with work before the Debtor received formal approval from the Navy. GMI asserts that the Debtor's actions constitute a waiver of this procedure. This Court agrees.[1]

---

**1.** I note that this issue might also be analyzed based on the alternative contract theories of oral modification of a written contract *see Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977), or altered performance and acceptance of that performance. The parties did not brief any of these concepts, though GMI's counsel raised the issue of waiver in his post-hearing memorandum. Under either theory, the Debtor's objection does not fare well.

In the context of contract performance, a waiver is a voluntary and intentional abandonment or relinquishment of a known right or advantage which, but for the waiver, the party would have enjoyed. *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir.1991) (cite omitted); *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265, 1269–70 (1982). Contract terms can be waived either expressly or by implication of the party for whose benefit the provision inures. *In re Gordon Car and Truck Rental, Inc.,* 59 B.R. 956, 962 (Bankr.N.D.N.Y.1985); *see Wolff & Munier,* 946 F.2d at 1009. Although not raised by GMI, I point out that the facts herein are also sufficient to sustain a claim of estoppel. An estoppel " 'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury.' " *Nassau Trust Co.,* 56 N.Y.2d at 184, 451 N.Y.S.2d at 667, 436 N.E.2d at 1269 (quoting *Triple Cities Constr. Co. v. Maryland Cas. Co.,* 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856, 858 (1958)). Estoppel is imposed by law in the interest of fairness to prevent the enforcement of rights which would work a fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that enforcement would not be sought. *Nassau Trust Co.,* 56 N.Y.2d at 184, 451 N.Y.S.2d at 667, 436 N.E.2d at 1268–69 (citation deleted).

As the evidence indicates, both the Debtor and GMI were clearly aware of the procedure to obtain Navy approval before proceeding with any changes in the repair work. This Court finds that credible evidence suggests that on many occasions this procedure was not complied with, rather, the Debtor directed GMI to begin the growth work without previously securing Navy permission. Taylor testified that when GMI documented growth work and presented the change orders to Alloway pursuant to the parties' arrangement, Alloway instructed GMI to "go ahead and do the work" and the Debtor would "settle on it later" with the Navy. This evidence was uncontroverted.

Here, the Debtor's conduct shows an indisputable departure from the agreed upon procedure to obtain Navy consent to proceed with growth work. "When a party knowingly receives and accepts the benefits of extra work outside the scope of a construction contract orally directed by himself and his agents, such conduct constitutes a waiver of the [written authorization] requirement." *S. Leo Harmonay, Inc. v. Binks Manufacturing Co.,* 597 F.Supp. 1014, 1032 (S.D.N.Y. 1984), *aff'd,* 762 F.2d 990 (2d Cir.1985). By instructing GMI to commence work, the Debtor effectively induced GMI's reliance to disregard the agreed upon procedure and, as such, is now estopped from complaining that GMI did not follow that very process before starting work. In short, it is apparent to this Court that the Debtor intentionally and voluntarily waived the agreed procedure and that GMI relied upon this behavior in affirmatively choosing not to observe the procedure and proceeding with its performance under the contract.

The Court finds that the Debtor, as the objecting party, has not sufficiently rebutted GMI's *prima facie* proof of claim on this issue and therefore, to the extent that the Debtor's objection is premised on this ground, the motion is denied.

## B. *Additional Charges and Billing Disputes*

The Debtor further objects to GMI's claim based on several aspects of GMI's billing invoices.

First, the Debtor objects to that portion of GMI's invoices charging the Debtor for additional work done by GMI due to delay and disruption in the course of the Navy project. Almost from the outset of the Navy renovation project, GMI was plagued by a litany of delays and disruptions due to, *inter alia*: loss of electrical power, heating and lighting on one of the ships, lack of a gangway in order for GMI's work crew to board the ships, unforeseen but necessary asbestos removal, and unsanitary bathroom facilities requiring GMI's workmen to use restrooms at a restaurant across the street from the shipyard. The record in this case is

replete with GMI's information reports to the Debtor itemizing these delays and disruptions. *E.g.,* Exs. 13 and 21. All of these interferences resulted in extra labor costs and/or additional materials. Moreover, these problems were exacerbated by the fact that the Navy insisted upon an ambitious "come aboard date" for the contractors to complete their work.

To establish what is essentially a breach of contract, a subcontractor must demonstrate that the general contractor caused substantial delay in the subcontractor's performance. *See Wolff & Munier,* 946 F.2d at 1007–08 (under New York contract law, general contractor breached subcontract, in part, by causing delays which in turn caused subcontractor to incur acceleration costs for which general contractor was ultimately responsible); *Quaker–Empire Constr. Co. v. D.A. Collins Constr. Co.,* 88 A.D.2d 1043, 1044, 452 N.Y.S.2d 692, 694 (3d Dep't 1982) (parties to construction contract impliedly agree not to hinder or obstruct other party's performance). As far as this Court can tell, GMI incurred substantial excess labor and material costs as a result of significant, unanticipated and in some respects, inexcusable complications arising from numerous difficulties on the ships which were in the control of the Debtor and/or the Navy. The Debtor contends that it never agreed to all of the requests for additional work. However, after reviewing GMI's information reports and appraising the hearing testimony, the Court concludes that the Debtor, instead of objecting to the work when it was proposed and instructing GMI not to do the work, acquiesced, either expressly or tacitly to virtually all of the work performed by GMI. As stated above, the Debtor cannot now tardily invoke objections and protest finished work when it accepted the work in the first place. *See Leo Harmonay,* 597 F.Supp. at 1032. In sum, it is obvious that GMI and the Debtor played loose with their agreements and undertook a considerable amount of work pursuant to oral agreements or representations which contributed to the troubles on this poorly managed project.

■ In a related objection, the Debtor complains about additional invoiced charges because of GMI's additional work after GMI received revised blueprints of the vessels. GMI argues that it was initially given inaccurate blueprints by either the Debtor or the Navy. Based on the evidence presented at the hearings, this Court is convinced that the specifications provided to GMI were entirely inadequate. These deficiencies arose because the original drawings or blueprints presented to GMI were outdated and failed to reflect major structural changes which had been made to the ships over the years. Some of the ships, in particular the U.S.S. Nitro, had undergone major repairs in the recent past. Taylor testified, and GMI's reports and invoices corroborate, that although GMI was aware that revised specifications often surface after a contracting job started, GMI (through Debona, its on site manager) was not alerted to the existence of the revised drawings until early December, 1989, two months after it began work. Indeed, much of the growth work on the project was the direct result of the updated specifications finally being made available to GMI. GMI's own information reports to the Debtor make clear that much of the additional work was "not taken into account by design at the time [of the bidding] but discovered later...." (GMI's Ex. 21). Given the circumstances, these charges were entirely necessary once the Debtor informed GMI to proceed with work. *See Leo Harmonay,* 597 F.Supp. at 1026 (failure of general contractor to provide layout drawings in a timely and orderly manner requiring subcontractor to work on accelerated basis with increased work hours and costs is basis to award subcontractor the extra costs). Bad as these defects were, they were only aggravated by the Navy's deadline for the contractors to complete the job.

■ In addition, as the Debtor knows, when it objected on similar grounds to another subcontractor's (creditor's) claim in this case, the Court explained that a contractor trying to perform to defective specifications may be entitled to costs incurred in attempting to meet the requirements of the original specifications, as well as the costs resulting from mistakes in the plans. *G. Marine Diesel,* 155 B.R. at 854 (citing E. Massengale,

*Fundamentals of Federal Contract Law,* at 124 (1991)).

█ Finally, the Debtor protests an additional 10% charge on piping supplies purchased by GMI. As Taylor testified, when GMI bid on the job, the Debtor and GMI agreed that GMI would purchase some of the necessary piping materials and bill the Debtor for these materials at cost plus 10%. (GMI's Exs. 16 and 22). The Debtor specifically agreed to this term when it was proposed by GMI. Furthermore, the Debtor's Program Office repeatedly signed off on GMI's progress and invoice reports which included the 10% addition to the cost of the piping. *E.g.,* GMI's Ex. 11. If the Debtor did not want to pay the additional 10% on the piping it should have objected earlier and not agreed to such an expense. For this reason, the Debtor's objection on this ground is without merit.

As to all of these grounds, this Court concludes that the Debtor has, likewise, failed to rebut GMI's *prima facie* proof of claim.

## CONCLUSION

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

Based on the foregoing analysis, the Debtor's motion to reduce or expunge GMI's claim is denied.

Therefore, at this point, GMI's claim against the Debtor's estate will be allowed in the sum of $214,217.79 and paid pursuant to the distribution authorized by this Court in the Debtor's confirmed plan of reorganization. This determination is, of course, without prejudice to GMI's right to add the $99,995.02 or any amount found to be due to it from the Debtor in the proceeding which is *sub judice* in a state court between the Debtor and GMI and Generation Refrigeration.

SETTLE AN ORDER in accordance with this Decision.

