**In re Michael FORTE, Setre Corporation, Foreal Homes, Inc., Debtors.**

**Bankruptcy Nos. 094–70708–511, 094–70710–511, 094–70711–511.**

United States Bankruptcy Court, E.D. New York.

May 6, 1999.

---

Berkman, Henoch, Peterson & Peddy, P.C. by Ronald M. Terenzi, Garden City, NY, for Michael Forte.

Geoffrey J. O'Connor, Southhampton, NY, Special Counsel for debtor Michael Forte.

### DECISION AFTER EVIDENTIARY HEARING

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

Michael Forte ("Forte" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 24, 1994. On December 18, 1996, the Debtor moved for an Order reducing claim number 13 filed by the United States Department of the Treasury, Internal Revenue Service ("IRS"). The IRS' original proof of claim was filed on August 2, 1994 and asserted a pre-petition, unsecured priority claim in the sum of $68,407.79. Forte objected to the claim and sought to reduce it to the sum of $14,020 on the sole ground that "the Debtor's books and records indicate a reduced amount due and owing to claimants." *See Application for Second Omnibus Order Reducing Claims,* dated Dec. 12, 1996, ¶ 8.

Although the IRS did not file any papers in opposition, the motion was repeatedly adjourned at the parties' request to allow them to negotiate a resolution of the motion. In June 1997, however, Forte filed supplemental papers indicating that the parties were unable to reach a settlement. In fact, the IRS had amended its proof of claim to assert an unsecured, priority claim for $403,472.14 and a general, unsecured claim for $52,592.74 plus interest.[1]

1. The IRS's claim asserts the following:

| Tax Type | Tax Period | Date Assessed | Amount | Interest |
|---|---|---|---|---|
| Income | 12/31/90 | estimated liability | $ 13,552 | $3,572.50 |
| Income | 12/31/92 | estimated liability | $ 66,444 | $4,503.64 |
| Income | 12/31/93 | estimated liability | $109,228 | –0– |
| Income | 12/31/93 | 6/10/96 | $206,372 | –0– |

In his supplemental submission, Forte argues that the increase in the IRS' claim results from its disallowance of certain deductions he had claimed for the tax years 1992 and 1993 concerning losses from Related Partners Property, Inc. ("Related"), a sub-chapter S corporation in which he was a 50 percent shareholder.

For its part, the IRS contends that Forte has not rebutted the *prima facie* validity of the IRS proof of claim because he has not demonstrated that Related was a valid sub-chapter S corporation, that he was a valid shareholder, or that, in any event, the deductions were properly disallowed because Forte had an insufficient basis in Related.

The Court conducted an evidentiary hearing which took place on January 13, 1998.[2] For the reasons that follow, the Court concludes that the Debtor has rebutted the *prima facie* validity of the IRS' proof of claim. The Court disagrees, however, with the Debtor's view as to the mount of his basis in Related and finds that it must be reduced to $779,621.73. As a result, the claim of the IRS must be modified to reflect the amount of taxes now due and owing, taking into account the Debtor's adjusted basis in Related as determined by this ruling.[3]

## Underlying Facts

It is undisputed that Forte and Alexander Abbate ("Abbate"), Forte's estranged son-in-law, were each 50 percent shareholders of Related. *See IRS' Statement of Undisputed Facts*, ¶ 1. Related was incorporated in Florida as a sub-chapter S corporation in March 1989 (Trial Tr. at 26)[4] and was formed to purchase and operate two apartment complexes, known as Cornerstone Apartments ("Cornerstone") and Sutton Place Apartments ("Sutton Place"). Abbate ran the day-to-day operations of Related and Forte was a "passive investor." Trial Tr. at 14.

At the evidentiary hearing, the Court received into evidence copies of 23 checks which allegedly show Forte's monetary contributions to Related. *See* Exh. 1. All checks are written from Forte's personal checking accounts maintained at The Chase Manhattan Bank or the National Bank of New York City during the period April 10, 1989 through December 24, 1991. Twenty of the checks are made payable to Related and total $536,903.73. The remaining checks are made payable to the following entities in the following amounts: (1) "Alexander Abbate"—$350,000; (2) "Cromwell ..."[5]—$15,000; and (3) "Hill,

The Debtor concedes that the estimate for 1990 ($13,552 + interest) and the actual assessment for tax year 1993 ($206,372) are correct. Therefore, at a minimum, the Debtor concedes that the amended proof of claim should be allowed in the sum of $223,496.50 (together with any interest owing thereon). At issue, then, is the Debtor's motion to disallow $180,175.64 (*i.e.*, the 1992 and 1993 tax year estimated liabilities).

2. During the evidentiary hearing, the Court heard the testimony of Michael Forte, Lawrence G. Ceasar and Vivian B. Bibi. The Court received into evidence Debtor's Exhibits 1, 5, 12, 13, 15 and 16, and the IRS' Exhibits A–H, J, O, AA, AB, AI, AJ and AL.

3. This Decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

4. Although Forte testified at the evidentiary hearing that Related was formed in 1989 and the IRS apparently concedes this fact (*see IRS Statement of Undisputed Facts*, ¶ 1), Forte's Statement of Financial Affairs, filed with his bankruptcy petition, lists Related as being

formed in 1970. This inconsistency is, however, not material to the matter at hand.

5. The name of the payee on this check is virtually unreadable. Another copy of this same check is annexed as part of Exhibit "B" to the *Supplemental Statement in Further Support of Debtor's Motion to Reduce Claim of Internal Revenue Service*. However, although on this copy the first name "Cromwell" is legible, the last name is partially illegible— only "_____berger" can be read. Abbate, at his deposition, made reference to the law firm of "Cromwell, Remsen, Phaffenberger, Dahlmeier and Griffin" and that this was the law

Ward & Henderson, P.A."—$160,000.[6] The total of all 23 checks is $1,061,903.73. Although written against his accounts, Forte testified that there were times he just signed his name on these checks and Abbate would fill in the name of the payee and the amount.[7] Trial Tr. at 15–17. Forte never asked for, nor received, promissory notes or loan agreements evidencing these payments to Related. Trial Tr. at 73.

In or about October 1989, Related, as well as Setre Corporation ("Setre") and Foreal Homes, Inc. ("Foreal"),[8] entered into a loan agreement with Southeast Bank, N.A. ("Southeast"). Although there was some confusion at the hearing regarding the character of this loan,[9] the Loan Agreement itself defines the loan as meaning:

the loan in the original principal mount of Four Million and No/100 Dollars ($4,000,000.00), extended by the Bank to the Borrower, and evidenced by the Term Loan Note [in the mount of $2,000,000] and the Letters of Credit [three in total aggregating $2,000,000].

Exh. 13, ¶ 1h. The IRS asserts that Forte's contributions to Related came from this loan with Southeast. Trial Tr. at 47. Forte denies this, asserting that the monies came from either his "building business" (*id.* at 54) or loans that he obtained from "Chase Manhattan and National Bank of North America."[10] *Id.* at 48.

As noted, Forte was the president and 20 percent shareholder of Setre, another sub-chapter S corporation formed by Forte to own and rent real estate buildings in New York. Trial Tr. at 31–32. In or about December 1991, Setre borrowed $450,000 from U.S. Capital Corporation ("USC").[11]

6. Abbate testified at his deposition that Hill, Ward & Henderson was "Paragon's attorneys" (Exh. AJ at 45), but he did not explain who "Paragon" is. Abbate also testified that this check was Related's "good faith deposit" on Cornerstone as it was "one percent of the sales price." *Id.* at 45–46.

firm that handled Related's closing in 1989. Exh. AJ at 102. It thus appears that the payee on this check is the Cromwell law firm.

7. Abbate agreed that this was the practice when he testified at his deposition which was taken approximately three months prior to the trial. Abbate claimed that Forte "would just send me five or six blank checks, blank meaning not filled in, just signed." Exh. AJ at 32.

8. Forte is the sole shareholder and president of Foreal and 20 percent shareholder and president of Setre 8 (Forte's wife, Adonia, is the remaining 80 percent shareholder of Setre). Both Setre and Foreal filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the same day Forte filed his petition. By Order dated July 2, 1997, Setre and Foreal's cases were substantively consolidated with Forte's bankruptcy case.

9. Both the IRS and Forte repeatedly referred to this loan as a "line of credit." *See, e.g.,* Trial Tr. at 33–36. During his deposition, Abbate also referred to this loan as a "revolving line of credit." Exh. AJ at 20. However, the Loan Agreement does not refer to any "line of credit." On its face, it is simply a term note and three letters of credit (two in favor of Provident National Bank and one in favor of Cornerstone Associates, Ltd.). Unfortunately, the record is not clear as to how much money was actually borrowed, whether money was actually paid out on the letters of credit and what the money was used for. Nonetheless, the answers to these questions are not material to the resolution of the instant controversy.

10. Although Forte initially stated that he obtained money from "Chase Manhattan and National Bank of North America", he later refers to "Chase Manhattan and Bank of New York." *See, e.g.,* Trial Tr. at 49, 51, 52, 53, 63 and 64. The 23 checks admitted into evidence demonstrate that they were drawn upon Forte's personal checking accounts at The Chase Manhattan Bank and National Bank of New York City. *See* Exh. 1.

11. As part of the collateral for the loan between USC and Setre, USC obtained a "[f]irst real mortgage made by Michael Forte to U.S. Corporation on premises located at 55 Jericho Turnpike, Jericho, New York." Exh. 12, Schedule B. Although the IRS contends that Setre was the owner of this property (Trial Tr. at 104–05), the "First Real Property Mortgage" (the "Mortgage"), annexed as part of Exhibit 12, denotes Forte as the "Mortgagor" who "warrants the title to the Premises." Mortgage, ¶ 9. Forte's schedule "A" to his

Forte was a guarantor on this loan. *See* Exh. 12. It is from this loan between USC and Setre that Forte ultimately made the $350,000 transfer to Abbate.[12] As Forte testified:

Q. So the primary borrower on this loan was Setre Corp., wasn't that correct?

A. I had to use that name, but it was my building and my name. I had to use that because of the usurious charges. They didn't want to give me that money, me, personally.

Q. The one the bank would go after principally, as the borrower, was Setre Corp.; isn't that correct?

. . .

A. They wrote the checks to Setre Corporation.

Q. From this 450, you wrote the $350,000 check to Related Partners?

A. Yes.

Trial Tr. at 105.

According to Forte, the $350,000 check was written out by Abbate and was intended to "cure a default that was about to happen" with respect to real property taxes owed on Related's Florida properties. Trial Tr. at 17–18. When asked why the check was made payable to Abbate, Forte stated that

[i]t was a last-minute situation on the taxes, and they had to be paid, so what he [Abbate] had done, I guess he had influence with the bank, and my cheek from New York would take 10 days to clear, so he manipulated or maneuvered something with the bank, whereas he

gave them his cheek, which cleared a way to pay the taxes.

*Id.* at 90. Forte then stated that the real estate taxes were, in fact, paid. *Id.*

In 1992, Related filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Southern District of Florida. Due to his medical condition at the time, Forte could not travel from New York to Florida and authorized his son, John Forte, to act on his behalf in Related's bankruptcy proceeding. Trial Tr. at 79. John Forte ultimately voted to accept Related's plan of reorganization, which scheduled Forte's claim at $434,042.82. Trial Tr. at 79–83; Exh. O. However, Forte claims he never received "a dollar" from Related prior to the bankruptcy (*id.* at 18) nor "a penny" during the bankruptcy.[13] *Id.* at 83. Related's chapter 11 bankruptcy case was subsequently converted to one under chapter 7 of the Bankruptcy Code.

At the evidentiary hearing, Forte also testified that he would lend money to Abbate, individually, from time to time. Trial Tr. 76–77. Forte testified as follows:

Q. When you would lend Mr. Abate [sic] money personally, you would write a check to Mr. Abate [sic], is that correct?

. . .

A. Yes, I did.

Q. When you would lend money to Related Partners, you would make a check to Related Partners; isn't that correct?

A. That's right.

bankruptcy petition lists the property located at 55 Jericho Turnpike, New York and identifies Forte as the 100% owner. Schedule "D" lists U.S. Capital Corporation as the mortgagee. Neither Setre's nor Foreal's bankruptcy petition lists this property. As the Court may take judicial notice of a Debtor's bankruptcy schedules filed in connection with a case (*see In re Lan Yik Foods Corp.*, 185 B.R. 103, 109 (Bankr.E.D.N.Y.1995)), it is apparent from the evidence presented that Forte, individually, and not Setre owns this property.

12. Although the loan to Setre from USC was in the principal amount of $450,000, the total net proceeds, after all closing costs was $371,043. *See* Exh. 12, Schedule "A" to the Loan Agreement. It was from this amount that Forte transferred the $350,000 to Abbate.

13. Abbate, at his deposition, agreed with Forte and testified that he was "positive" the trustee in Related's bankruptcy case never made a distribution to Forte. Exh. AJ at 67.

*Id.* at 77. However, Forte never sued Abbate to get this money back because of the familial relationship with Abbate [14] and, for a period of time, he "couldn't find him." *Id.* at 78.

Toward the end of the evidentiary hearing, the IRS focused upon a certain conveyance which purportedly transferred 100 shares of Related stock [15] from Forte, individually, to Forte as Trustee of a trust (the "Trust"). Exh. AG. The Trust Agreement is dated December 19, 1989 and provides, *inter alia,* that "[d]uring the lifetime of the Settlor [Forte], the Trustee [Forte] shall pay so much or all of the net income from the principal of this trust . . . as the Settlor shall direct." *Debtor's Reply Memorandum,* Exh. A, Art. II. The IRS argues that this transfer severs Related's subchapter S status and transforms the Trust, and not Forte, as the shareholder of Related.

Abbate's prior deposition transcript was admitted into evidence upon the request of the IRS. Exh. AJ. Abbate's deposition was taken on October 27, 1997, at which he testified that Forte was a "passive investor" in Related. *Id.* at 24. Abbate also estimated that Forte lent Related "a million dollars" (*id.* at 19) and that these monies were intended to be loans, although no loan documents were ever executed. *Id.* at 17. Abbate also corroborated Forte's testimony regarding the source of the funds that were lent to Related. He testified that Forte obtained the money from his "New York bank account" and not from Related's loan with Southeast Bank. Exh. AJ at 21. Nonetheless, Abbate's testimony was not always consistent with that of Forte's and, at times, Abbate contradicted himself.

When asked if Forte ever received monies back from Related, Abbate gave conflicting answers. First, he stated that Forte "[i]nitially . . . took a hundred thousand dollars, but he gave that back a month afterwards." Exh. AJ at 10. Then he revealed that while "there was never a distribution," Abbate may

> have given him [Forte] another hundred thousand dollars for something, but he probably gave it back to me because it was always like an in and out with him. It was never any money per se.

*Id.* at 12. Abbate further testified:

> Q. And subsequent to that [the $100,-000 payment to Forte] were any additional checks written out of Related Partners' accounts to Michael Forte?
>
> A. Probably during the course of the three years, in and outs. I don't recall exactly how much.

Exh. AJ at 12. Although the IRS pressed Abbate about Forte receiving a total of $250,000 from Related, Abbate was initially adamant that it was not that much. *Id.* at 13. However, this answer quickly changed:

> Q. . . . . I wanted to know if Related Partners wrote checks to Michael Forte for approximately two hundred fifty thousand dollars?
>
> A. Yes.

*Id.* at 16.

The only other evidence concerning possible distributions to Forte from Related came from an IRS agent, Vivian Bibi ("Bibi"), who audited Related in 1993 and prepared a written report detailing her findings (the "IRS Report"). Exh. AL. The IRS Report states that Forte received distributions from Related in the sum of $95,500 in 1990 and $105,300 in 1991. *Id.* at 13. However, when asked to explain the source of this information, Bibi could not specifically recall which books and records she reviewed in order to arrive at her figures. Trial Tr. at 139.

---

**14.** Abbate also testified at his deposition that Forte never asked for any money back. Exh. AJ at 82–83.

**15.** The record is entirely devoid of any reference as to how many total shares of Related stock were actually owned by Forte and Abbate.

Inquiry was also made of Abbate as to the circumstances surrounding Forte's $350,000 check that was made payable to him instead of Related. Abbate testified that he filled out this check and that the money was used to "pay real estate taxes on the properties." Exh. AJ at 47. Abbate further stated the following:

Q. Why was this check written to yourself Alexander Abbate as opposed to Related Partners?

A. I don't know.

Q. Was this a loan to you? Was this check a loan to you?

A. I could never pay it back. I don't think so. It was a loan to the company.

. . . .

Q. Do you recall—do you ever recall telling a revenue agent that this check for three hundred fifty thousand dollars was a loan to you then loaned to the company?

A. No. Why would I do that?

Q. Would that be an untrue statement?

A. Yeah. I don't recall saying that. It was a loan to me, and I loaned it to the company?

Q. Yeah.

A. Could be. I really don't recall, Greg.

*Id.* at 47–49. Abbate later testified that the check was deposited into his personal account and that he wrote a check to Related for $345,000 for the real estate taxes. *Id.* at 49.

On re-direct examination by the IRS, Abbate testified:

Q. Do you recall telling an agent that you contributed three hundred forty-five thousand dollars at year ending 12/31/91 to Related Partners?

A. He asked me about the check I deposited, yeah, yes.

Q. Do you recall telling the agent that the three hundred forty-five thousand dollars was loaned to you from Mr. Forte?

A. Loaned to me?

Q. Yes.

A. No. He loaned it to the company. Loaned it to me?

Q. It's possible you told the agent that?

A. Possibly.

*Id.* at 107.

Abbate was then asked to review the IRS Report with respect to the 1993 audit of Related. The IRS Report states that Abbate

claims he contributed $345,000 at year end 12–31–91 for a loan payable due to him in the amount of $237,257. Analysis of the Shareholder's tax return for the respective years do not corroborate the contributions made by the Shareholder. The Shareholder claimed that his father-in-law, Michael Forte, loaned him the money and he subsequently loaned the money to the Company.

Exh. AL. Abbate agreed that these statements were "pretty accurate" (Exh. AJ at 109) although he stated there was "no other reason" for the loan except to put it into Related. *Id.* at 111–12.

Forte filed joint federal income tax returns with his wife for the years 1989 through 1993. In 1989, 1990 and 1991, Forte claimed losses from Related in the mounts of $113,337, $246,890 and $144,244, respectively, for a total of $504,471. *See* Exhs. B–D and 5. In addition, Forte claimed losses from Related on his 1992 and 1993 federal income tax returns in the amounts of $245,366 and $316,567, respectively. *See* Exhs. E and 5. However, neither Forte nor Abbate knew if Related had a profit or a loss in 1992 and 1993. Trial Tr. at 25; Exh. AJ at 69.

Related's federal income tax returns for 1989 through 1991 were also admitted into evidence at the request of the IRS. *See* Exhs. F–H. According to the 1989 return, shareholder loans to Related decreased from $522,911 to $492,912. In 1990 and 1991, shareholder loans, as reflected on the

balance sheets contained in the tax returns, totaled $573,897 and $740,563, respectively.

The IRS examined Forte's tax returns, and disallowed much of the Debtor's losses for 1992 and 1993, due to "lack of basis." The IRS did not, however, produce copies of any checks from Related to Forte evidencing any repayments by Related to the Debtor on account of his investment. Lastly, both parties agree that there was a subsequent audit adjustment which increased Related's income by $67,668, which, in turn, increased Forte's basis in Related by this amount. *See Debtor's Post Hearing Memorandum, at 8, and United States' Post–Trial Brief,* at 12.

### Arguments of the Parties

In his supplemental papers, Forte contends that the IRS's disallowance of his deductions was predicated upon: (i) Forte's alleged failure to provide adequate documentation of his basis for the loss (*i.e.*, proof of payments by Forte *to* Related), and (ii) Forte's alleged failure to prove that he did not thereafter receive any funds back *from* Related. Forte argues that the IRS's stated reasons for its disallowance of his deductions are without merit.

First, Forte claims that in September, October and December 1996, he gave the IRS copies of his checks showing he had made the payments, "thus creating the basis against which losses were claimed." In addition, he claims that it is "patently unfair and unjustified" for the IRS to require him to "prove a negative"—*i.e.*, that he did not receive any payments back from Related. Rather, he contends that the IRS should have to prove that he received

money from Related before it can disallow his deductions.

Forte also argues that he cannot provide documents which tend to prove that he did not receive any payments from Related, since the chapter 7 trustee in the Related bankruptcy case has stated that he does not have any such documents in his possession, and because the bank at which Related maintained its accounts was liquidated by the Federal Deposit Insurance Corporation, making its records "virtually impossible to track."

Lastly, Forte contends that even if he has not adequately proved his basis for the loss deductions (which he denies), he is *still* entitled to claim these deductions as "suspended passive activity losses" pursuant to Section 469 of the Internal Revenue Code. The deductions, which arise from Related's losses from rental activity, became fully recognizable in 1993, which is the year that Related ceased to exist. He therefore claims that he is entitled to the deductions claimed, whether they are characterized as net operating losses or suspended passive activity losses. Accordingly, Forte contends that the IRS's claim must be disallowed to the extent that it exceeds $223,496.50.[16]

The IRS counters, first alleging that Forte has failed to establish that he is a shareholder of Related or that Related is a valid sub-chapter S corporation. The IRS contends that Forte ceased to be a shareholder of Related when he transferred 100 shares of Related stock to the trust he created in 1989. The IRS also argues that Forte failed to establish that the trust is a permissible trust pursuant to 26 U.S.C. § 1361(c)(2),[17] and that, even if it were,

---

**16.** As stated in footnote 1, *supra,* Forte concedes that the estimate for 1990 and the actual assessment for 1993 are correct. Only the estimated liabilities for 1992 and 1993 are currently in dispute.

**17.** 26 U.S.C. § 1361(c)(2) provides in relevant part

(c) **Special rules for applying subsection (b).—**

. . .

**(2) Certain trusts permitted as shareholder.—**

(A) **In general.**—For purposes of subsection (b)(1)(B), the following trusts may be shareholders:

(i) A trust all of which is treated (under subpart E of part I of subchapter J of this chapter) as owned by an individual who is a citizen or resident of the United States.

Forte failed to make a required election pursuant to 26 U.S.C. § 1361(d)(2).[18] Lastly, the IRS contends that even if it could be said that Forte is a shareholder and that Related is a valid sub-chapter S corporation, Forte was not entitled to claim losses from Related in 1992 and 1993 because he had insufficient basis in the corporation.

## DISCUSSION

A proof of claim properly executed and filed constitutes *"prima facie* evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f). The claim is "deemed allowed" unless a party in interest objects, and if an objection is made, the Court, after notice and a hearing, "shall determine the amount of such claim ... and shall allow such claim in such amount" with certain exceptions not relevant here. 11 U.S.C. § 502.

### A. *Allocation of the Burden of Proof.*

The general rule in a bankruptcy case is that a filed proof of claim is statutorily entitled to *prima facie* validity, and the objecting party bears the initial burden of producing sufficient evidence to rebut the claimant's *prima facie* case. *In re G. Marine Diesel Corp.,* 155 B.R. 851, 852–53 (Bankr.E.D.N.Y.1993); *In re Kahn,* 114 B.R. 40, 44 (Bankr.S.D.N.Y.1990). If the objectant does so, the burden shifts back to the claimant. "[I]t is ultimately 'for the claimant to prove his claim, not for the objector to disprove it,'" and the claimant must prove his claim by a preponderance of the evidence. *In re G. Marine Diesel Corp., supra,* 155 B.R. at 853 (*quoting In*

*re Gorgeous Blouse Co.,* 106 F.Supp. 465 (S.D.N.Y.1952)).

The difficulty presented in this case is that the claimant is the IRS. Outside of bankruptcy, the general rule in tax cases is that the taxpayer bears the burden of proof in all respects. An assessment is afforded a presumption of correctness, and the taxpayer shoulders the burden of rebutting that presumption. *Resyn Corp. v. United States,* 851 F.2d 660, 662–63 (3rd Cir.1988) (*citing Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935)). Under the Internal Revenue Code, the burden of proof with respect to claimed tax deductions rests upon the taxpayer, since "deductions are a matter of legislative grace, and the taxpayer seeking the benefit of a deduction must show that every condition which Congress has seen fit to impose has been fully satisfied." *Wisely v. United States,* 893 F.2d 660, 666 (4th Cir.1990).

The parties disagree, as do several Courts of Appeals, about the proper allocation of the burden of proof in a bankruptcy case where the claimant is the IRS. The Courts of Appeals for the Fifth, Ninth and Tenth Circuits hold that bankruptcy alters the traditional allocation of the burden of proof in tax cases, and that the ultimate burden of persuasion is on the IRS to prove its claim in bankruptcy. *See In re MacFarlane,* 83 F.3d 1041 (9th Cir.1996), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *In re Fullmer,* 962 F.2d 1463 (10th Cir.1992) (without discussion); *In re Fidelity Holding Co., Ltd.,* 837 F.2d 696 (5th Cir.1988).[19]

---

18. 26 U.S.C. § 1361(d)(2) provides in relevant part:

 **(d) Special rules for qualified subchapter S trust.—**

 ...

 **(2) Election.—**
 **(A) In general.—**A beneficiary of a qualified subchapter S Trust (or his legal representative) may elect to have this subsection apply.

19. The Debtor cites *Gran v. IRS,* 964 F.2d 822 (8th Cir.1992), for the proposition that the

Eighth Circuit places the ultimate burden of proof upon the IRS. *Gran* does seem to apply a rule which shifts the burden back to the IRS once the debtor rebuts its *prima facie* case. But, during its discussion of the burden of proof, the Court stated "we decline to reach that issue ... in light of the bankruptcy court's ruling that the government established the validity of its claim by convincing evidence. The question whether the burden of proof is on the government or on the bank-

The Courts of Appeals for the Third, Fourth and Seventh Circuits have applied the opposite rule—that is, that the burden of proof is on the taxpayer even when bankruptcy intervenes. *See U.S. I.R.S. v. Charlton*, 2 F.3d 237 (7th Cir.1993) (without discussion); *In re Landbank Equity Corp.*, 973 F.2d 265 (4th Cir.1992); *Resyn Corp. v. United States*, 851 F.2d 660 (3rd Cir.1988) (without discussion).

■ The Court of Appeals for the Second Circuit has not squarely addressed the question. Nevertheless, courts in this district have followed the Fifth, Ninth and Tenth Circuits, finding that the ultimate burden of proof rests with the IRS. *See, e.g., In re Avien, Inc.*, 390 F.Supp. 1335, 1341–42 (E.D.N.Y.1975), *aff'd*, 532 F.2d 273 (2d Cir.1976); *In re Seafarer Fiber Glass Yachts, Inc.*, 475 F.Supp. 1097 (E.D.N.Y.1979) (*quoting Avien* with approval); *In re Ashline*, 37 B.R. 136, 138 (Bankr.N.D.N.Y.1984) ("in the instant proceeding, if the Debtor produces evidence and demonstrates facts tending to defeat the *prima facie* proof of claim, the burden of proof will ultimately rest with the IRS"). As stated by the District Court in *Avien*, and acknowledged here by the IRS, while

> the burden of proof with respect to deductions claimed is normally on the taxpayer ..., that is not the case in bankruptcy proceedings where the burden of establishing its claim rests on the government. *In re Gorgeous Blouse Co.*, 106 F.Supp. 465 (S.D.N.Y.1952). The government is aided, however, by a strong presumption which arises in its favor by the filing of a sworn proof of claim; a prima facie case is established and the burden of going forward with rebutting evidence is on the debtor.... The ultimate burden of persuasion remains on the government.....

*Avien*, 390 F.Supp. at 1341–42 (citations omitted). For these reasons, the Court concludes that if the Debtor rebuts the *prima facie* validity of the IRS' proof of claim, the ultimate burden of persuasion is

upon the IRS to prove its claim in bankruptcy.

### B. Has the Debtor Rebutted the Prima Facie Validity of the IRS' Proof of Claim?

■ The next inquiry is whether the Debtor has rebutted the *prima facie* validity of the IRS' proof of claim, thereby shifting the burden to the Government to prove its claim. " '*Prima facie* case' has a clear meaning: evidence of an amount and quality sufficient to send a case to the trier of fact." *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir.1990). The Debtor "may not rebut the *prima facie* case merely by stating that the amount of taxes claimed by the Service is not correct; the [Debtor] must produce some evidence to support that statement." *In re White*, 168 B.R. 825, 829 (Bankr.D.Conn.1994). Before reviewing the evidence presented by the Debtor in this case, however, a brief discussion of shareholder basis in a subchapter S corporation is necessary.

As reflected in their post-trial memoranda, both parties agree that

> all deductions and losses of an S corporation (e.g., capital losses and NOLs) are passed through to and (except as otherwise limited by the Code) deductible by the shareholders. However, a shareholder may deduct his pro rata share of these passed-through items only to the extent of his adjusted basis ... in his S corporation stock, determined by taking into account the increases in basis for his share of the S corporation income during the year ... plus any debt owed to him by the corporation.
>
> ....
>
> A shareholder's basis in the stock of an S corporation is *increased* by his share of the corporation's income items that are passed through to him *** Code § 1367(a)(1); Reg. § 1.1367–1(b). *** Basis in stock is *decreased* but not below zero by: the shareholder's share of the

rupt thus is wholly academic in this case, and there is no occasion for us to decide it."

corporation's items of deduction, loss and non-deductible expenses \*\*\* and distribution to the shareholder that aren't taxable as dividends (I.R.C. § 1367(a)(2); Reg. § 1.1367–1(c)).

.... ⁻

If an S corporation has no accumulated earnings and profits (E & P), the amount distributed reduces the shareholder's basis in the stock.

*Federal Tax Handbook*, [1997](RIA) at ¶¶ 3376, 3378, 3379 (reprinted in *Debtor's Post–Hearing Memorandum*, at 7–8, and *United States Post–Trial Brief*, at 11).

The parties also agree that taxpayer basis can be broken down into the following formula, with "T" meaning "Taxpayer" and "C" meaning sub-chapter S corporation:

> **Basis** = (Amounts Contributed or Loaned by T to C) **minus** (Amount of Any Distribution from C to the T) **plus** (T's Share of Taxable Income from C) **minus** (T's share of Tax Losses from C).

*Debtor's Post–Hearing Memorandum*, at 8, and *United States Post–Trial Brief*, at 12. Using this formula, Forte asserts that his basis in Related equals $1,129,261.73, computed as follows: (i) $1,061,953.73 in loans from Forte to Related; plus (ii) $67,668 pursuant to the IRS audit adjustment for 1990. Forte testified that he did not receive any distributions from Related which would cause a decrease in his adjusted basis.

Because the parties agree that the $67,668 income from the IRS 1990 audit adjustment of Related increases Forte's adjusted basis by this amount, the only amount in dispute is the amount of the shareholder loans. As evidence of the $1,061,953.73 in shareholder loans, Forte points to the 23 checks admitted into evidence at trial. Of these 23 checks, 20 are made payable directly to Related from Forte's personal bank accounts at The Chase Manhattan Bank and the National Bank of New York City. These checks clearly support Forte's assertion that he made loans to Related and are directly tied to the calculation of his adjusted basis in the corporation.

Of the three remaining checks, two are made payable to attorneys involved in the purchase of Cornerstone and Sutton Place. Both the check and Abbate's testimony support a finding that the law firm of Cromwell, Remsen, Phaffenberger, Dahlmeier and Griffin was, more likely than not, the payee on one check; it is undisputed that this firm handled Related's closing in 1989. In addition, Abbate testified, without controversion, that the check made payable to "Hill, Ward & Henderson, P.A." constituted the one percent down payment on Cornerstone. Thus, the substance of these two checks was that Forte made these payments on behalf of Related. As a result, the Court finds that these amounts should be added to Forte's adjusted basis in Related..

The final check, and the one subject to the most heated debate, is the check from Forte's personal bank account made payable to Abbate for $350,000. Both Forte and Abbate testified that this $350,000 was earmarked for real estate taxes becoming due on the real property. As noted, Abbate's testimony was inconsistent as to whether this check was a loan to him or to Related. All that is required, however, at this stage of the analysis is whether the Debtor has presented sufficient evidence to rebut the *prima face* validity of the IRS claim. The Court concludes that he has and that the purpose of the $350,000 check was to pay the real estate taxes owed by Related. Therefore, it should also be added to Forte's adjusted basis in Related. As a result, the total of all 23 checks— namely, $1,061,953.73, plus the $67,668 from the IRS 1990 audit adjustment—supports Forte's assertion that his adjusted basis in Related totaled $1,129,621.73 in 1991.

It is also undisputed that Forte claimed a total of $1,073,852 in flow-through losses on his 1989 through 1993 Individual Federal Income Tax Returns. Therefore, since

this amount is less then Forte's adjusted basis, the deductions, at this stage of the burden-shifting analysis, appear appropriate and thus sufficient for Forte to rebut the *prima facie* validity of the IRS proof of claim. As "[t]he burden of production shifts . . . when the objectant has produced facts sufficient to demonstrate that an actual dispute exists . . . ," (*In re Frederes*, 98 B.R. 165, 166–67 (Bankr.W.D.N.Y. 1989)), which Forte has done, the burden shifts to the IRS to prove its claim by a preponderance of the evidence.

### C. *Has the IRS Proven Its Claim by a Preponderance of the Evidence?*

The IRS essentially asserts three arguments in support of its claim. These arguments are: (i) Forte failed to establish that the Trust which acquired Forte's shares of stock meets the eligibility requirements of 26 U.S.C. § 1361(c)(2) and that even if it does, Forte failed to demonstrate that a required election was made pursuant to 26 U.S.C. § 1361(d)(2); (ii) Forte, by transferring his shares of Related stock to the Trust, ceased to be a shareholder of Related and thus is not entitled to claim pass-through losses from this subchapter S corporation; and (iii) assuming Forte is a shareholder and Related is a valid sub-chapter S corporation, Forte had insufficient basis in Related to claim over $1,000,000 in losses.

### 1. *The Transfer of Forte's Stock in Related to the Trust.*

The first two arguments of the IRS may be addressed simultaneously as they both concern the same issue—*i.e.*, the transfer of the stock to the Trust. The IRS argues that Forte cannot claim pass-through losses from Related because he ceased to be a shareholder when he transferred 100 shares of stock to the Trust in December of 1989. The only evidence produced at the hearing concerning this transfer was

an "Assignment Separate from Certificate" which purportedly shows that Forte transferred 100 shares of his Related stock to himself as trustee of the Trust. Although the IRS elicited some testimony at the hearing from Forte regarding this transfer, the record is anything but clear concerning what happened.

 Nonetheless, annexed to Forte's post-trial reply memorandum is a copy of the "Trust Agreement." On its face, the Trust Agreement supports the IRS' assertion that these shares of stock were transferred to the Trust. The Debtor argues, however, that this issue should not be addressed because: (i) the IRS raised this issue for the first time at trial; (ii) in its statement of undisputed facts, the IRS does not challenge that Forte and Abbate were each 50 percent shareholders of Related; and (iii) the IRS' statement of disputed facts and disputed legal issues makes no mention of such an argument. Nevertheless, the Court has found no authority, and Forte fails to point to any, which precludes the IRS from asserting this argument for the first time at trial, provided that the Debtor has been given sufficient opportunity to respond. No court favors "trial by ambush" but there is no *per se* rule prohibiting the introduction of an argument or defense by a party during the course of a trial. Since the parties have had the opportunity to address this issue fully in their post-trial memoranda, the Court does not believe that the Debtor is prejudiced by consideration of the IRS' latest argument.

 Section 1361 of the Internal Revenue Code ("IC") provides that a small business corporation may elect to be treated as a *subchapter S corporation if such an* election is in effect. *See* 26 U.S.C. § 1361(a)(1).[20] A "small business corporation" means a domestic corporation "which does not have as a shareholder a person

---

**20.** Here, there is no dispute that such an election was in effect during the relevant time

period.

(other than an estate and other than a trust described in subsection (c)(2)) who is not an individual." 26 U.S.C. § 1361(b)(1)(B). The IRS asserts that the "Debtor failed to produce any evidence to demonstrate" that the Trust is a valid shareholder. *United States' Post–Trial Brief,* at 10. However, as noted earlier, it is not *Debtor's* burden to prove that the trust *is* valid; it is the *IRS'* burden to prove that the trust *is not* valid, a fact clearly not proven at the hearing.

On its face, the Trust Agreement reveals that the Trust may be a shareholder under Section 1361 of the IC. In particular, Section 1361(c)(2)(A)(I) provides that "[a] trust all of which is treated (under subpart E of part I of subchapter J of this chapter) as owned by an individual who is a citizen or resident of the United States" may be a shareholder. "Subpart E of part I of subchapter J" consists of Sections 671 through 679 of the IC and "contains provisions taxing income of a trust to the grantor ... under certain circumstances...." 26 C.F.R. § 1.671–1(a)(1999). The circumstances applicable here are: (1) if the grantor or a nonadverse party has certain powers over the beneficial interest under the trust (26 U.S.C. § 674); and (2) if the grantor or a nonadverse party has the power to distribute income to or for the benefit of the grantor or the grantor's spouse (26 U.S.C. § 677). *See id.*

The Trust Agreement in the instant case provides that "[d]uring the lifetime of the Settlor [Forte], the Trustee [Forte] shall pay so much or all of the net income from the principal of this trust ... as the Settlor shall direct." Section 674 of the IC provides that "the grantor is treated as the owner in every case in which he ... can affect the beneficial enjoyment of a portion of a trust...." 26 C.F.R. § 1.674(a)–1(a) (1999). Additionally, Section 677 of the IC provides that the grantor of the trust is treated as the owner if he retains an interest in the income of the trust. *See* 26

C.F.R. § 1.677(a)–1 (1999). As Forte can affect the beneficial enjoyment of the Trust and has retained an interest in the Trust's income, under Section 1361(c)(2)(A)(I) of the IC, the Trust may be a shareholder of Related. Therefore, Related has not lost its subchapter S status by reason of this transfer.

■ The IRS' next argument, namely, that Forte is no longer a shareholder of Related by reason of the transfer to the Trust and thus not able to claim these losses, is also unavailing. Section 671 of the IC states:

> Where it is specified in this subpart that the grantor ... shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits *of the grantor* ... those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax *of the individual.*

26 U.S.C. § 671 (emphasis added). More simply, "a grantor ... includes in computing his taxable income and credits those items of income, deduction, and credit against tax which are attributable to or included in any portion of a trust of which he is treated as the owner." 26 C.F.R. § 1.671–2(a) (1999). Applying these precepts to the circumstances here, Forte is treated as the owner of the Trust pursuant to Sections 674 and 677 of the IC. "If stock is held by a qualified subpart E trust, the deemed owner of the trust is treated as the shareholder." 26 C.F.R. § 1.1361–1(h)(3)(I)(A). Therefore, Forte is entitled to claim Related's losses on his individual income tax returns; these losses pass through Related to the Trust and then to Forte, individually. Accordingly, Related has retained its subchapter S status and, for federal income tax purposes, Forte is treated as the shareholder.[21]

---

**21.** Before leaving this discussion concerning

the transfer to the Trust, the Court notes that

### 2. *Forte's Adjusted Basis in Related.*

■ The IRS' remaining argument attacks the amount of forte's claimed adjusted basis in Related. Initially, the IRS argues, with no supporting authority, that since Forte authorized his son to accept $434,042.82 as the amount of his claim in Related's bankruptcy proceeding, his adjusted basis in Related can be no higher than that amount. As evidence of this acceptance and amount, the IRS placed into evidence a "Certificate of Attorney for Debtor on Acceptance of Plan, Report on Amounts to be Deposited and Certificate of Amount Deposited" ("Certificate of Acceptance"), which lists all ballots filed in Related's bankruptcy proceeding, the amount claimed and whether the claimant accepted or rejected the plan of reorganization. *See* Exh. O.

The Certificate of Acceptance lists Michael Forte with a *scheduled* claim of $434,042.82. It also indicates that the plan of reorganization was accepted. However, these facts, standing alone, are insufficient to demonstrate that Forte's basis is less than he now claims. First, it appears from the face of this Certificate of Acceptance that Forte never filed a proof of claim in Related's bankruptcy proceeding; the document lists the claimed amount with "sch" following it, indicating that the amount was *scheduled* and not set forth on a proof of claim *filed* by Forte. Second, the mere fact that Forte agreed to Related's proposed plan of reorganization is not probative as to the actual amount of his basis in Related. Forte may have had any number of reasons to accept the plan of reorganization with a reduced amount (*e.g.*, it may have been the product of negotiation). Accordingly, the Court finds that the Certificate of Acceptance, standing alone, is insufficient to support the IRS' contention that Forte's adjusted basis in Related is no higher than $434,042.82.

■ Next, the IRS asserts that Forte's basis in Related equaled, at most, $740,563 at the end of 1991. This assertion is premised solely on information contained in Related's 1991 Federal income tax return. Related's balance sheet (Schedule L to the tax return) shows that at the end of 1991, shareholder loans totaled $740,563. *See* Exh. H. However, it is clear from the record that Forte was a "passive investor" in Related and, more likely than not, had no role in preparing Related's tax returns. Additionally, "[c]ases have discounted the significance of repayments that consisted merely of entries in the corporation's books, as opposed to cash transfers made by the shareholder." *Wang v. Commissioner*, 1998 WL 144991 (U.S.Tax Ct. Mar. 31, 1998) (citations omitted).[22] Here, Forte submitted 23 checks evidencing payments made to, or for the benefit of, Related. The IRS' reliance on the 1991 tax return, standing alone, is insufficient to sustain its burden of proof on this claim objection motion.

the IRS has also argued, albeit in a limited fashion, that even if the Trust is a permissible trust under Section 1361(c)(2), Forte has failed to demonstrate that the required election pursuant to Section 1361(d)(2) was made. Again, as the burden of proof is now on the IRS, it is the burden of the IRS to prove that an election was necessary and not made; a burden it has clearly failed to carry. In any event, this last argument by the IRS must also fail on the merits. The Code of Federal Regulations makes clear that "qualified subpart E trusts" are different from "electing qualified subchapter S trusts." *See* 26 C.F.R. § 1.1361–1(h)(1)(I) and (iii). This Regulation further states "[i]f stock is held by a qualified subpart E trust, the deemed owner of the trust is treated as the shareholder" and "[i]f stock is held by an electing QSST [qualified subchapter S trusts], see paragraph (j)(7) of this section for the rules on who is treated as the shareholder." *Id.* at 1.1361–1(h)(3)(I)(A) and (C). Accordingly, if the trust is a qualified subpart E trust, as is the case here, no election under Section 1361(d)(2) is required.

**22.** In *Wang*, the taxpayer placed into evidence corporate tax returns to show that the balance of "loans to shareholders" decreased over time. The Tax Court found that "this evidence [was] insufficient to carry the day for" the Taxpayer. *Id.*

■ The essence of the IRS' remaining arguments concerns the source of the funds transferred to Related. As urged by the IRS,

[t]o increase the basis in the indebtedness of an S corporation, there must be an economic outlay on the part of the shareholder. *Estate of Leavitt v. Commissioner,* 875 F.2d 420, 422 (4th Cir. 1989), *affg.,* 90 T.C. 206, 1988 WL 8227 (1988); *Brown v. Commissioner,* 706 F.2d 755, 756 (6th Cir.1983), *affg.,* T.C.Memo. 1981–608, 1981 WL 11008. The economic outlay required under section 1366(d)(1)(B) must leave "the [taxpayers] poorer in a material sense." *Perry v. Commissioner,* 54 T.C. 1293, 1296, 1970 WL 2283 (1970), *affd. per order* (8th Cir.1971) (*quoting Horne v. Commissioner,* 5 T.C. 250, 254, 1945 WL 20 (1945)). Although a bona fide loan from a shareholder to an S corporation will increase the shareholder's basis, the shareholder must make an actual economic outlay and directly incur the indebtedness. *Underwood v. Commissioner,* 63 T.C. 468, 476, 1975 WL 3175 (1975), *affd.* 535 F.2d 309 (5th Cir. 1976). As was noted by this Court in *Raynor v. Commissioner,* 50 T.C. 762, 770–771, 1968 WL 1515 (1968): No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation. Prior to that crucial act, "liability" may exist, but not debt to the shareholders.... The shareholders must make actual disbursements on the indebtedness before they can augment their bases for the purpose of deducting losses. *Estate of Leavitt v. Commissioner, supra* at 422.

*Hafiz v. Commissioner,* 1998 WL 113926, (U.S.Tax Ct. Mar. 16, 1998).

With respect to the $350,000 check, it is undisputed that Setre was the borrower on the loan with USC and that Forte was simply a guarantor. Therefore, Forte did not "directly incur the indebtedness" under the rule laid down in the *Hafiz* case. The mere fact that Forte and USC had other motives (*i.e.,* to avoid usurious charges) when naming Setre and not Forte as the borrower does not defeat the substance of this transaction. Both Forte and USC had reasons for placing the loan in Setre's name (*e.g.,* without doing this, the loan may not have been made). Nonetheless, it would be inequitable to go back and change the substance of the transaction merely because doing so will now benefit Forte. He obtained the benefit of the loan in 1991—Related's real estate taxes were paid. He cannot now reap a second benefit by claiming the transaction was somehow different.

Similarly, although it is apparent that Forte, individually, owned the property located at 55 Jericho Turnpike, Jericho, New York, this ownership interest is simply irrelevant to the analysis. This property was merely additional collateral for the loan between USC and Setre. Forte's ownership of the property pledged as collateral for the loan to Setre cannot transform it into a loan between himself and USC.

The Loan Agreement between USC and Setre is dated December 20, 1991, and the $350,000 check from Forte to Abbate is dated December 24, 1991, a mere four days later. Additionally, Forte's own testimony at the evidentiary hearing confirms that the funds sent to Abbate came from these loan proceeds. Forte testified that it was from this $450,000 that he wrote the $350,000 check to Abbate. Although factually distinguishable from the guaranty cases cited by the IRS, the end result here is the same: Setre incurred the $450,000 indebtedness and made the actual economic outlay of $350,000 for the benefit of Related. To hold otherwise would indeed merely be placing form over substance.

It is true that the $350,000 check was written against Forte's personal bank account. How this money found its way there is, at this point, a mystery. Howev-

er, as stated above, the IRS must prove its claim by a preponderance of the evidence. The factual circumstances established by the IRS make it more likely than not that the $350,000 came from the loan proceeds obtained by Setre and not from Forte himself.[23] Accordingly, Forte's adjusted basis must be reduced by this amount.

Although Forte contends that the ultimate source of this $350,000 is not relevant, such an argument must also fail. Cases have held that " '[a] transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred.' . . . We must view this case not with an eye to what could have been done but rather what was in fact done." *Burnstein v. Commissioner*, 1984 WL 15384 (U.S.Tax Ct. Feb. 13, 1984) (*citing Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 579–80, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977)). If the Court were to follow this line of reasoning, the outcome would remain the same.

The record shows that what actually occurred here is that Forte tendered a check payable to Abbate for $350,000; nothing more, nothing less. For reasons not precisely demonstrated, Forte chose to advance these funds to Abbate and not Related. The fact that it was Abbate who wrote out the check makes little difference—Forte chose to trust Abbate to accurately fill in the payee on these checks; he

must now shoulder any adverse repercussions. Accordingly, Forte

> "cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form. The same principle applies here. . . . We cannot now alter the form of the transaction."

*Burnstein, supra*, 1984 WL 15384 (*quoting Legg v. Commissioner*, 57 T.C. 164, 169, 1971 WL 2535 (U.S.Tax Ct.1971), *aff'd*, 496 F.2d 1179 (9th Cir.1974)).

If the Court looks to the substance of the transaction, it was Setre and not Forte who borrowed money from USC for the benefit of Related. If the form of this transaction prevails, the same result obtains, and the claimed basis must be rejected. It was Forte merely transferring $350,000 to Abbate and a transfer from Forte to *Abbate* would not give Forte any basis in *Related*. The fact that this money may have gone to pay Related's real estate taxes is therefore irrelevant because the Court must look to what actually occurred under such an analysis, not what may have occurred. Accordingly, under either scenario, Forte may not increase his adjusted basis in Related by this $350,000.[24]

Forte has, however, asserted an alternative argument with respect to

---

**23.** While not specifically addressed by the IRS, the fact that the $350,000 loan was from Setre, and not Forte, in some ways explains why Related's 1991 tax return listed shareholder loans at $740,563. As Setre was not a shareholder of Related (and could not be one pursuant to 26 U.S.C. § 1361), this loan could not be included in the shareholder loan calculation. Subtracting this loan amount from Forte's claimed adjusted basis leaves $711,953.73; an amount within $30,000 of the figure contained on the tax return. Perhaps this $30,000 represents loans from Abbate to Related, although there is no evidence regarding this fact. In any event, a $30,000 differential is more plausible than a $320,000 differential.

**24.** Forte's accountant, Geoffrey J. O'Connor, in his Affidavit, dated June 3, 1997, asserts

that even if Related's losses were reduced, Forte would be entitled to a loss deduction carryover in 1993 as either a net operating loss or a suspended passive activity loss pursuant to 26 U.S.C. § 469. However, again under either scenario, Forte cannot deduct this $350,000 as a net operating loss or a suspended passive activity loss. If the $350,000 transaction is viewed as a loan from Setre to Related, Forte is not involved in the equation and cannot claim any losses (although, if such were the case, such a calculation may affect Forte's basis and/or income in Setre). Similarly, if the transaction is viewed as between Forte and Abbate, it is a non-business transaction which would not trigger any net operating losses or suspended passive activity losses.

this $350,000. He claims that even if this $350,000 is not included in his adjusted basis in Related, he may nevertheless deduct it as a bad debt. Section 166 of the IC provides that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." 26 U.S.C. § 166(a). Yet, a "mere statement that one was unable to collect a debt, in the absence of further evidentiary facts establishing this conclusion, is an inadequate basis to substantiate the claim of worthlessness." *Eagle v. Commissioner*, 242 F.2d 635, 637 (5th Cir.1957). As advanced by the IRS, "[i]n order to show that a note is worthless the creditor must exhaust every reasonable means of collection. He must show that there was no hope of recovering anything from the debtor." *Bell v. United States*, 120 F.Supp. 931, 935 (M.D.Pa.), *aff'd*, 217 F.2d 646 (3d Cir.1954). Here, the only evidence Forte points to which tends to show that this $350,000 is deductible as a bad debt is Abbate's statement that he could never repay this amount. The IRS, on the other hand, has established that Forte never attempted to recoup this money because of the familial relationship with Abbate and because he could "not find" him. Accordingly, Forte's bad debt argument must fail.

Although successful in reducing Forte's basis in Related by $350,000, the IRS has not sustained its burden with respect to the remaining amount of adjusted basis claimed by Forte.[25] Once again, the IRS asserts that "Debtor failed to establish" that he made an actual economic outlay with respect to the remaining $711,953.73. However, it is the IRS' burden to establish that Forte, himself, did not make this outlay of funds. The IRS attempted to elicit testimony from Forte regarding the source of the funds used to make these loans to Related. Forte, time and time again, stated that he obtained loans from The Chase Manhattan Bank and Bank of New York to make these advances. The IRS has offered no evidence which rebuts this assertion and has offered absolutely no proof to support its claim that these funds came from loans to Setre which Forte personally guaranteed.[26]

██ Lastly, the IRS claims that Forte's adjusted basis must be reduced by the amount of distributions he received from Related. In support of this asser-

---

**25.** Although it attacked the check written by Forte to Abbate, the IRS has not specifically attacked the two checks made payable to the two attorneys involved in Related's closing on the Florida properties. At first blush, it appears that these two checks, as was the case with the Abbate check, were not made payable directly to Related and thus should not be included in Forte's adjusted basis. However, it is clear that with respect to these two checks, Forte made "an actual economic outlay and directly incurr[ed] the indebtedness" (*Underwood v. Commissioner*, 63 T.C. 468, 476, 1975 WL 3175 (U.S.Tax Ct.1975), *aff'd*, 535 F.2d 309 (5th Cir.1976)), sufficient enough to include the amounts in his adjusted basis. Additionally, what distinguishes these checks from the check written to Abbate is that Forte directly paid a liability of Related when tendering the checks to the attorneys. The attorneys were merely agents involved in the Related closing, and had a duty to apply the payments in favor of Related. By contrast, Abbate "was free to invest [the $350,000] in lottery tickets or uranium stock" *Bonded Financial Servs. v. European Am.*

*Bank*, 838 F.2d 890 (7th Cir.1988); he was under no duty [aside from a moral one] to use this money on behalf of Related. Therefore, what "actually occurred" with respect to the two checks made payable to the attorneys was that Forte tendered payments directly for the benefit of Related. While the Abbate check may have had the same end result, the Court cannot look to what "may" have happened. *See Burnstein, supra*, 1984 WL 15384 (U.S.Tax Ct. Feb. 13, 1984). Accordingly, as the form of these transactions are different, the IRS has not sustained its burden of proof with respect to these two checks and they may properly be included in Forte's adjusted basis in Related.

**26.** Although it argued at the evidentiary hearing that "it's pretty clear that the monies Mr. Forte contributed were from the line of credit of Southeast" (Trial Tr. at 47), the IRS, in its post-trial brief, appears to abandon this argument. There simply is no proof that Forte, individually, ever received any money from Southeast or that the $711,000 he contributed to Related came from that loan.

tion, the IRS first points to a $30,000 decrease in shareholder loans shown on Related's 1989 Federal income tax return. This contention is clearly inconsistent with the IRS' prior position given that, if tax returns were dispositive, Forte's basis should be $740,463, the amount stated in Related's 1991 tax return. Nonetheless, as noted, Related's tax returns merely reflect information from its books and records, the significance of which should be discounted as they were out of the control of Forte.

The IRS then contends that Abbate's testimony that Forte received distributions ranging from $100,000 to $250,000 from Related in 1989 and 1990.[27] However, Abbate's testimony concerning this topic was anything but clear and fraught with inconsistencies. First, Abbate stated there was "never a distribution," then he stated Forte may have received $100,000, then possibly between $150,000 and $200,000 and finally $250,000. Such inconsistencies cannot form the conclusion that Forte received a distribution from Related in 1990 and 1991. Therefore, the IRS has not proven by a preponderance of the evidence that Forte ever received a distribution from Related which would reduce his adjusted basis. Accordingly, the Court finds that Forte's adjusted basis in Related equals $711,953.73, plus the undisputed amount of $67,668, for a total adjusted basis of $779,621.73.

However, as the amount of Forte's adjusted basis directly bears on the extent of losses he may claim, which in turn may increase his adjusted gross income, which,

in turn, will determine the extent of other allowable deductions, the parties are better able to determine the appropriate amount of taxes presently due and owing the IRS. Accordingly, the parties are directed to confer with each other regarding the correct amount of taxes now due, bearing in mind that the Court finds that Forte's actual basis in Related is $779,-621.73.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties to this core proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(B). Venue is proper.

2. For all of the foregoing reasons, the motion by the Debtor, Michael Forte, seeking an Order reducing the claim of the Internal Revenue Service is hereby granted in part and denied in part. The Federal taxes presently due and owing are to be computed using $779,621.73 as Forte's adjusted basis in Related.

3. The parties are directed to confer with each other with respect to the appropriate amount of taxes presently due and owing the Internal Revenue Service, keeping in mind that Forte's adjusted basis in Related is $779,621.73. By using this figure, presumably, the parties will be able to stipulate as to the applicable amount of taxes due. If so, the parties are directed to file a stipulation with the Court and the IRS shall file an amended proof of claim no later than May 28, 1999. If the parties are unable to reach an agreement, they must advise the Court in writing by that

---

27. The IRS also asserts that the IRS Report shows that Forte received distributions from Related in 1990 and 1991 in the amount of $95,500 and $105,300 respectively. However, as stated by the Court at the evidentiary hearing, "[i]f, at any point in time, the government is asking the Court to make [sic] determination that indeed the books and records of Related reflected a loan receivable in this particular amount, the result would be no, I would not base a finding on that. I do not know, based on Ms. Bibi's testimony, exactly what she received. And those docu-

ments, as many have indicated, are not available." Trial Tr. at 141. Later, the Court continued, "I'm not going to take Ms. Bibi's conclusions or so-called facts, as she found them in this report, to be those facts. If the government wants me to make a finding that Mr. Forte, indeed received a withdrawal or distribution, then you're going to do it by a document other than Ms. Bibi's report." *Id.* at 146. Accordingly, while Bibi's report was received into evidence, the Court "declin[ed] to give [it] any evidentiary basis." *Id.* at 148.

same date, and the Court will schedule a further evidentiary hearing.

The Debtor is directed to settle an order on notice within ten days hereof.